**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| VOLKSWAGEN GROUP OF AMERICA | ) | |
| CHATTANOOGA OPERATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:22-cv-00191 |
| v. | ) | |
| | ) | Judge Atchley |
| SAARGUMMI TENNESSEE, INC. | ) | |
| | ) | Magistrate Judge Lee |
| Defendants. | ) | |

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Volkswagen Group of America Chattanooga Operations, LLC ("Volkswagen"),

submits this supplemental Memorandum of Law in support of its Motion pursuant to Federal

Rule of Civil Procedure 65 for a preliminary injunction against SaarGummi Tennessee, Inc.

("SaarGummi").

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 5

II.     STATEMENT OF FACTS ................................................................................... 7

        A.      SaarGummi supplies Volkswagen with Parts according to a long-term supply
                contracts. ................................................................................................. 7

        B.      SaarGummi wrongfully demanded a price increase and has threatened to stop
                shipping the Parts. ................................................................................... 9

        C.      Volkswagen faces irreparable harm if SaarGummi stops shipping. ...................... 9

III.    ARGUMENT ..................................................................................................... 11

        A.      Volkswagen is likely to succeed on the merits of its claims for breach of
                contract and specific performance. ........................................................ 13

                1.      The Contract represents a valid, binding, and enforceable contract for
                        the sale of the Parts at the agreed-upon price terms. ................................. 14

                2.      SaarGummi has anticipatorily breached the Contract. ............................. 14

                3.      Injunctive relief is particularly appropriate here in light of the
                        Contract's specific performance provision. ................................................ 16

        B.      Volkswagen will suffer irreparable injury if SaarGummi is not ordered to
                perform its contractual obligations. ...................................................... 18

        C.      The balance of harms favors granting injunctive relief. ...................................... 20

        D.      The public interest is served by granting injunctive relief. ................................. 21

        E.      The Court should set the bond amount at $0, or another nominal amount. .......... 21

IV.     CONCLUSION .................................................................................................. 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Basicomputer Corp. v. Scott*,
   973 F.2d 507 (6th Cir. 1992) ........................................................................ 11, 20

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) ............................................................................. 21

*Mich. Bell Tel. Co. v. Engler*,
   257 F.3d 587 (6th Cir. 2001) ............................................................................. 20

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
   55 F.3d 1171 (6th Cir. 1995) ............................................................................. 22

*Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*,
   246 Fed. Appx. 929 n.2 (6th Cir. 2007) ............................................................. 12

*Performance Unlimited v. Questar Publishers, Inc.*,
   52 F.3d 1373 (6th Cir. 1995) ............................................................................. 12

*Six Clinics Holding Corp., II v. Cafcomp Sys.*,
   119 F.3d 393 (6th Cir. 1997) ............................................................................. 13

*TRW Inc. v. Indus. Sys. Assoc. Inc.*,
   47 F. App'x 400 (6th Cir. 2002) .................................................................... 16, 18

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth.*,
   163 F.3d 341 (6th Cir. 1998) ............................................................................. 12


**Cases**

*Apple Corps. v. A.D.P.R., Inc.*,
   843 F. Supp. 342 (M.D. Tenn. 1993) ................................................................. 18

*Barrette Outdoor Living, Inc. v. Vi-Chem Corp.*,
   2014 WL 3579297 (E.D. Tenn. July 21, 2014) ................................................... 15

*Consol. Container Co., LP v. Warren Unilube, Inc.*,
   2006 WL 522424 (W.D. Tenn. Mar. 3, 2006) ..................................................... 15

*Dayco Prod., LLC v. Thistle Molded Grp., LLC*,
   2019 WL 423523 (E.D. Mich. Feb. 4, 2019) ...................................................... 15

*F.S. Sperry Co. v. Schopmann*,
   304 F. Supp. 3d 694 (E.D. Tenn. 2018) ............................................................. 21

*Fid. Brokerage Servs. LLC v. Clemens*,
   2013 WL 5936671 (E.D. Tenn. Nov. 4, 2013) ................................................... 11

*Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*,
   749 F. Supp. 794 (E.D. Mich. 1990) .................................................................. 18

*Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*,
　　2008 WL 4279358 (E.D. Mich. Sept. 16, 2008) ................................................. 21

*Memphis Ctr. for Reprod. Health v. Slatery*,
　　2020 WL 3957792 (M.D. Tenn. July 13, 2020) ................................................. 20

*Ohio State Univ. v. Thomas*,
　　738 F. Supp. 2d 743 (S.D. Ohio 2010) ................................................................. 22

*Pay(Q)r, LLC v. Sibble, et al.*,
　　2016 WL 687884 (N.D. Ohio Feb. 19, 2016) ...................................................... 12

*Selective Ins. Co. of Am. v. Env't, Safety & Health, Inc.*,
　　2015 WL 914824 (E.D. Tenn. Mar. 3, 2015) ....................................................... 22

*Shelby Cnty. Advocates for Valid Elections v. Hargett*,
　　348 F. Supp. 3d 764 (W.D. Tenn. 2018) .............................................................. 12

*Skyros, Inc. v. Mud Pie, LLC*,
　　2016 WL 3165625 (W.D. Tenn. June 3, 2016) .................................................... 22

*Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*,
　　2021 WL 1602427 (S.D.W. Va. Apr. 23, 2021) ................................................... 15

**Statutes**

Tenn. Code Ann. § 47-2-609 ...................................................................................... 16

Tenn. Code Ann. § 47-2-609(1) .................................................................................. 15

Tenn. Code Ann. § 47-2-610 .............................................................................. 14, 15

Tenn. Code Ann. § 47-2-711(2)(b) ............................................................................. 16

Tenn. Code Ann. § 47-2-716 ...................................................................................... 16

Tenn. Code Ann. § 47-2-716(1) .................................................................................. 16

**Federal Rules**

Federal Rule of Civil Procedure 65 ............................................................................. 1

**Other Authorities**

Section 2-609 of the UCC ........................................................................................... 15

Section 2-610 of the UCC ........................................................................................... 14

Section 2-711 of the UCC ........................................................................................... 16

# I. INTRODUCTION

Volkswagen and SaarGummi are parties to supply contracts that requires SaarGummi to timely ship automotive parts—in particular, certain sealing systems (hereinafter the "Parts")—to Volkswagen, which are then used in the assembly of the Volkswagen Atlas and Volkswagen Atlas Cross Sport. Although fully aware of their contractual obligations to timely deliver parts at the agreed-upon price, SaarGummi notified Volkswagen that it would stop shipping the Parts by **July 18, 2022**, and, in fact, ***did stop shipping Parts on July 18, 2022***. Upon receipt of Volkswagen's Motion for Temporary Injunction (Doc. 3), SaarGummi agreed to resume shipping parts for an unspecified period of time. Although Volkswagen has repeatedly requested written assurance that SaarGummi will not stop, or threaten to stop, deliveries of Parts going forward, SaarGummi has failed to provide such assurances.

This Court denied Volkswagen's motion for temporary restraining order (Doc. 12) on the grounds that a temporary restraining order seeking an affirmative act required a high burden of proof. While SaarGummi had agreed that an unspecified delivery of Parts would be made available on July 19th, Volkswagen could not say how long that delivery would allow the plant to continue without knowing the details of that delivery, and therefore did not show "immediate harm" and meet that burden.

But under Sixth Circuit law, the same standard applies to both prohibitory injunctions and mandatory injunctions. Preliminary injunctive relief is necessary here because SaarGummi's actions threaten to shut down Volkswagen's assembly operations. Each delivery of Parts allows the Chattanooga plant to operate approximately 1.5 days of vehicle production. SaarGummi is well aware that cutting off the supply of the Parts will force the shutdown of Volkswagen's assembly operations, which would cause irreparable harm to Volkswagen's position in the

industry as a whole. SaarGummi also understands Volkswagen has been unable to find an alternate supplier without a significant disruption in the supply chain. Thus, if SaarGummi fails to perform its contractual obligations, Volkswagen will not be able to secure an alternate supply source in time to avoid a supply chain shutdown, which will cause catastrophic and irreparable injury to Volkswagen and its customers. For this reason, an ultimate award of money damages for SaarGummi's anticipatory repudiation will not adequately compensate Volkswagen for the immediate losses it will suffer if SaarGummi stops shipping in accordance with its supply contracts.

SaarGummi has implied in communications with Volkswagen that it has renegotiated its contracts with a number of other vehicle manufacturers, and it has also been able to meet Volkswagen's supply requirements since the hearing on Volkswagen's Motion for Temporary Restraining Order. Therefore, any concern that SaarGummi "can't" meet its contractual obligation to Volkswagen is unwarranted. SaarGummi simply wants more money for the Parts. While it could have negotiated a risk-sharing pricing provision in its contract with Volkswagen, it did not, and SaarGummi cannot now refuse to perform because it is unhappy with the deal it negotiated.

Accordingly, Volkswagen requests that the Court grant its motion and enter a preliminary injunction, ordering SaarGummi to continue complying with its existing contractual obligations to timely supply Volkswagen with automotive parts pending resolution of the parties' dispute on the merits.

## II.    STATEMENT OF FACTS

### A.    SaarGummi supplies Volkswagen with Parts according to a long-term supply contracts.

Volkswagen, as buyer, and SaarGummi, as seller, are parties to a series of Nomination Agreements for the supply of certain sealing systems, which are automotive component parts (the "Nomination Agreements").  (Verified Complaint for Injunctive Relief and Damages ("Ver. Compl."), at ¶ 5).  Copies of the Nomination Agreements are attached as **Exhibit A.**

Significantly, the Nomination Agreements incorporate by reference Volkswagen's Production Terms and Conditions of Purchase (the "Terms and Conditions").  A copy of the Terms and Conditions is attached as **Exhibit B.**[1]  Volkswagen and SaarGummi have entered into a series of purchase orders spanning from approximately January, 2017 through today, all of which are governed by the Nomination Agreements and the Terms and Conditions.  The Nomination Agreements, the Terms and Conditions, and the purchase orders will hereinafter collectively be referred to as the "Contract".

SaarGummi supplies Volkswagen with the Parts for use in assembly of the Volkswagen Atlas and Volkswagen Atlas Cross Sport.  Pursuant to the Nomination Agreements, SaarGummi's obligations include the development, manufacture, and delivery of the Parts as required by Volkswagen. (**Ex. A**). Under Section 5 of the Terms and Conditions, SaarGummi has agreed that:

> "[P]rices are not subject to increase, unless specifically stated in
> the Order, the RFQ Documents or a Prior Agreement, and Seller
> assumes the risk of any event or cause affecting prices, including
> without limitation, . . . increases in raw material costs, inflation,

---

[1] *See* Nomination Agreements, **Ex. A**. The Terms and Conditions as revised on July 1, 2022, govern the Nomination Agreements. The Terms and Conditions allow Volkswagen to revise them from time to time, which it recently did on July 1, 2022. Notably, the relevant terms quoted herein have not changed since SaarGummi contracted with Volkswagen.  *See* **Ex. B**, Terms and Conditions, ¶ 42.

increases in labor and other production and supply costs, and any other event which impacts the price or availability of materials or supplies."[2]

The Terms further state that "Seller may not suspend performance of the Order or terminate the Order for any reason." (**Ex. B**, Terms and Conditions § 20).   And the Terms and Conditions state that "either party may, with respect to a Claim, apply to a court for equitable relief, including a temporary restraining order, preliminary injunction or other interlocutory or relief[.]" (**Ex. B**, Terms and Conditions § 38.1(f)).  Additionally, they provide that "[a]ny court relief sought under this Section shall be brought in and subject to the exclusive venue and jurisdiction of the courts of Hamilton County, Tennessee or the U.S. District Court for the Eastern District of Tennessee, as applicable[.]" (*Id.*)

Recognizing the nature of the automotive industry and the critical need for timely deliveries and uninterrupted supply, and the fact that Volkswagen does not manufacture these specially-made Parts, the parties have also agreed that money damages would be an inadequate remedy to Volkswagen if deliveries by SaarGummi are not made as required. (Ver. Compl. ¶ 13).  Notably, Section 15 of the Terms and Conditions provides:

> In any action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies or transition support . . . Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Order and that, in addition to all other rights and remedies that Buyer may have, Buyer shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus Buyer's reasonable attorneys' fees.[3]

---

[2] (**Ex. B**, Terms and Conditions § 5).
[3] (**Ex. B**, Terms and Conditions § 15).

**B.     SaarGummi wrongfully demanded a price increase and has threatened to stop shipping the Parts.**

In June of 2021, SaarGummi began demanding a price increase with respect to the Parts. Volkswagen had multiple conversations with SaarGummi regarding the demands, and continued to negotiate with SaarGummi through June of 2022. Thereafter, on July 8, 2022, SaarGummi notified Volkswagen that certain "external factors" entitled SaarGummi to "declare Force Majeure," and that "continued production and delivery in accordance with the underlying agreements [was] commercially impractical and impossible." *See* July 8, 2022 letter attached as **Exhibit C**. Yet, before Volkswagen had sufficient time to even formulate a response to the July 8, 2022 letter, SaarGummi followed up with a letter on July 13, 2022, in which it stated unequivocally that it would no longer ship the Parts beginning on <u>July 18, 2022</u>. *See* July 13, 2022 letter attached as **Exhibit D**.

Upon receiving SaarGummi's letter dictating the imminent cutoff of supply, Volkswagen wrote to SaarGummi on July 14, 2022, reminding SaarGummi of its obligations under the Contract and demanding adequate assurances that it would continue production and shipment pursuant to the Contract. *See* July 14, 2022 letter attached as **Exhibit E**.

Volkswagen has attempted to resolve this issue since receiving the July 13, 2022 letter. SaarGummi did, in fact, stop deliveries on July 18, 2022. While SaarGummi has temporarily resumed deliveries in response to Volkswagen's Motion for Temporary Restraining Order (Doc. 3), SaarGummi has refused to provide any assurances that it will not stop deliveries again.

**C.     Volkswagen faces irreparable harm if SaarGummi stops shipping.**

SaarGummi's threatened refusal to ship parts requires injunctive relief. Volkswagen's supply chain requires timely delivery of all component parts, otherwise the entire supply chain shuts down, stopping assembly at Volkswagen. (Ver. Compl. ¶ 31 (Doc. 1), Declaration of

Daniel Soto ("Dec."), **Exhibit F** ¶ 16). Volkswagen requires a timely delivery model, which is standard in the automotive industry and means that it does not have a sufficient inventory of excess parts. (*Id.*). The Parts SaarGummi manufactures are unique, component automotive parts that must meet demanding engineering specifications and require extensive certification and validation for production, and SaarGummi is the sole source of supply of these products. (Ver. Compl. ¶ 20; Dec. ¶ 16). Volkswagen cannot readily obtain replacement parts from another supplier, nor can it manufacture them internally. (*Id.*). Each shipment of Parts generally contains enough parts to support 1.5 days of vehicle production. (Dec. ¶ 16). Consequently, if SaarGummi fails to provide the Parts in accordance with its contractual obligations, the impact on Volkswagen and its ability to manufacturer automobiles is immediate. (*Id.*)

Such a disruption to Volkswagen's supply chain will, without question, have a dramatic negative financial impact on Volkswagen. (Dec. ¶ 17). SaarGummi is aware Volkswagen has no ready replacement source of supply for these Parts. (Ver. Compl. ¶ 20; Dec. ¶ 17). Moreover, any delay in the delivery of these Parts, delivery of less than the required contract amount or stoppage in delivery of the same can lead to an immediate shutdown of Volkswagen's assembly process, which in turn could lead to substantial losses in revenue—likely millions of dollars per day. (*Id.* ¶ 21; Dec. ¶ 17). SaarGummi fundamentally understands the nature of Volkswagen's business and that abruptly stopping deliveries will cause catastrophic harm to Volkswagen. (Ver. Compl. ¶ 22; Dec. ¶ 17). Also, resourcing a new supplier for the Parts would likely take 9 to 12 months if SaarGummi is allowed to stop shipping the Parts in accordance with its contractual obligations. (Dec. ¶ 17).

The gravity of such harm will include, but not be limited to, Volkswagen stopping assembly of vehicles related to the Parts, delaying the launch of Volkswagen's new electric

vehicle, the Volkswagen ID.4, and it be the impetus to having to send up to 3,000 Volkswagen workers home without pay. (Dec. ¶ 18). Volkswagen has also been on a hiring spree to accommodate the labor needs for the production of the Volkswagen ID.4, and if its Assembly Plant is shut down due to SaarGummi's refusal to ship the Parts, that would cause further layoffs and hiring issues. (*Id.*). The negative PR of a shut down would also substantially harm Volkswagen's reputation. (*Id.*). This would also cause further unavailability of vehicles on the market during a time when vehicle supply is already a critical issue in the United States. (*Id.* ¶ 23; Dec. ¶ 18). Additionally, existing consumers of Volkswagen vehicles could also be impacted if those vehicles are in need of repairs involving the Parts SaarGummi supplies. (*Id.*).

Moreover, if SaarGummi is not enjoined to supply the Parts pursuant to its contractual obligations and to provide adequate assurances of future performance, Volkswagen's business reputation and goodwill in the automotive industry will be severely damaged, causing it incalculable and irreparable injury. (Dec. ¶ 19).

## III.   ARGUMENT

Under well-established standards, a party is entitled to injunctive relief under Rule 65 when the party has demonstrated: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable harm in the absence of injunctive relief; (3) greater harm would result to the moving party from the denial of injunctive relief than to the opposing party where injunctive relief is granted; and (4) the public interest would be better served by issuing injunctive relief. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992); *Fid. Brokerage Servs. LLC v. Clemens*, 2013 WL 5936671, at *4 (E.D. Tenn. Nov. 4, 2013). "[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny

injunctive relief." *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

Importantly, the Sixth Circuit has rejected the notion that a "mandatory" injunction places a higher burden on the moving party than a prohibitory injunction. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (rejecting the "heavy and compelling" standard of the Tenth Circuit for mandatory injunctive relief, and holding that the traditional preliminary injunctive standard – the balancing of equities – applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief). *See also Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 Fed. Appx. 929, 935 n.2 (6th Cir. 2007) (declining to apply a heightened burden of proof to a request for mandatory injunction on the grounds of *United Food*); *Pay(Q)r, LLC v. Sibble, et al.*, 2016 WL 687884, at *1 (N.D. Ohio Feb. 19, 2016) ("The Sixth Circuit does not require a heightened evidentiary burden when the moving party seeks a mandatory injunction, one that alters the status quo by ordering the performance of an act, as opposed to a prohibitory injunction that maintains the status quo").[4]

All four factors are met here. SaarGummi has clear contractual obligations to continue to produce and timely deliver Parts ordered under its Contract with Volkswagen. And SaarGummi's failure to meet that obligation is a material breach of the Contract. SaarGummi declared it would stop shipping by **July 18, 2022**, and ***did in fact stop shipping Parts***. SaarGummi has temporarily resumed shipments for an unspecified period of time and refuses to

---

[4] In its Order on Volkswagen's Motion for Temporary Restraining Order (Doc. 12), the Court cites *Shelby Cnty. Advocates for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 769 (W.D. Tenn. 2018) for the notion that a mandatory injunction requires a higher burden than a prohibitory injunction. The court in *Shelby* reached its conclusion by interpreting prior case law allowing interlocutory appeals of mandatory TROs. But *Shelby*'s broad reach is contrary to the law of the Sixth Circuit set forth in *United Food*, which has not been overturned.

commit to continue shipments. The parties' Contract, however, does not permit SaarGummi to unilaterally suspend performance.

SaarGummi's threatened stoppage will undoubtedly cause significant, irreparable damage to Volkswagen, and SaarGummi has agreed that money damages would be an inadequate remedy to Volkswagen if deliveries are not made as required under the Contract. Injunctive relief would prevent this irreparable harm without causing any other harm to third parties or the public.

### A. Volkswagen is likely to succeed on the merits of its claims for breach of contract and specific performance.

Volkswagen is likely to succeed on the merits of its claims for breach of contract and specific performance, because the Contract is valid, binding, and enforceable, and the evidence invariably shows that SaarGummi has anticipatorily repudiated the Contract through its relentless demands for price increases and threats to no longer ship the Parts. A plaintiff must show more than a mere possibility of success to establish the likelihood of success on the merits. *Six Clinics Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 402 (6th Cir. 1997). "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

Its claim of force majeure under the Contract is also inapplicable to this situation and has no effect on its contractual obligations.[5] In addition, SaarGummi unequivocally agreed in the Contract that monetary damages are not an adequate remedy for anticipatory repudiation.

---

[5] The Force Majeure clause in Volkswagen's Terms and Conditions is not relevant to this dispute. SaarGummi seeks to eschew its contractual obligations due to increases in supply costs due to Covid-19 and the war in Ukraine (*see,* **Ex. C**), however, the Contract states that "[t[he change in cost or availability of materials or components based on market conditions, supplier actions, or contract disputes or any labor strike or other labor disruption applicable to Seller or any of its subcontractors or sub-suppliers, will not excuse Seller's performance (under theories of

1. **The Contract represents a valid, binding, and enforceable contract for the sale of the Parts at the agreed-upon price terms.**

Volkswagen and SaarGummi are large, sophisticated players in the automotive industry with various offices and facilities across the globe. They entered into a series of Nomination Agreements for the supply of the Parts to be used in the assembly of the Volkswagen Atlas and the Volkswagen Atlas Cross Sport. The Nomination Agreements and the governing contract documents require, among other things, that SaarGummi develop, manufacture, and deliver the Parts as required by Volkswagen. (*See*, **Ex. A**). Moreover, the Terms and Conditions governing the Contract unambiguously provide that SaarGummi may not unilaterally increase Part prices and that SaarGummi may not suspend performance under the Contract for any reason. (**Ex. B**, Terms and Conditions §§ 5, 20). SaarGummi could have negotiated for a risk-sharing agreement. It did not. The Contract is valid and should be enforced.

2. **SaarGummi has anticipatorily breached the Contract.**

SaarGummi is under a contractual obligation to deliver the Parts ordered by Volkswagen on the date the Parts are required to be delivered and in the quantities ordered by Volkswagen. Yet SaarGummi has anticipatorily repudiated the Contract by declaring, on multiple occasions, that it would cease shipping the Parts by **July 18, 2022**. In fact, it did cease shipping Parts. While shipments have resumed temporarily, SaarGummi has refused to promise continued delivery of Parts.

Section 2-610 of the UCC governs anticipatory repudiation. *See* Tenn. Code Ann. § 47-2-610.[6] The Official Comments to Section 2-610 explain that "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or

_____

force majeure, commercial impracticability or otherwise), and Seller assumes these risks." *See* **Ex. B**, at ¶ 23.

[6] The Terms and Conditions provide that Tennessee substantive law governs. (**Ex. B**, Terms and Conditions § 37).

demonstrates a clear determination not to continue with performance." *Id.*, Cmt. 1. This includes any "action which reasonably indicates a rejection of the continuing obligation." *Id.*, Cmt. 2. Thus, when a "fair reading" of a party's demand "amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation." *Id.*

Courts have found that in the automotive or similar industries, a seller's action in informing a buyer that it will not deliver goods at the contract price is an anticipatory repudiation. *See Dayco Prod., LLC v. Thistle Molded Grp., LLC*, 2019 WL 423523, at *6 (E.D. Mich. Feb. 4, 2019) ("[The seller] clearly repudiated by informing [the buyer] that they were unwilling to deliver at the contract price."); *Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 2021 WL 1602427, at *4 (S.D.W. Va. Apr. 23, 2021) (seller's stated intention not to timely ship automotive parts under the contract constituted an anticipatory repudiation under Michigan's version of the UCC).[7] *See also Consol. Container Co., LP v. Warren Unilube, Inc.*, 2006 WL 522424, at *7 (W.D. Tenn. Mar. 3, 2006) (unqualified statement of intent to terminate in advance of expiration of contract term constituted a repudiation for which the plaintiff may recover under Tenn. Code Ann. § 47-2-610).

This is exactly what SaarGummi has done here. Although Volkswagen continues to perform all of its obligations under the Contract, SaarGummi summarily stopped shipping Parts under the Contract. This repudiation is a direct, material breach of SaarGummi's obligation to supply the Parts to Volkswagen.

SaarGummi has also repudiated the Contract by failing to offer adequate assurance of performance. Under Section 2-609 of the UCC and Tenn. Code Ann. § 47-2-609(1), "[w]hen

---

[7] The *Dayco* and *Sogefi* cases both apply Michigan's version of the UCC; however, Michigan and Tennessee have adopted virtually identical versions of the Uniform Commercial Code. *See Barrette Outdoor Living, Inc. v. Vi-Chem Corp.*, 2014 WL 3579297, at *7 (E.D. Tenn. July 21, 2014).

15

reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance[.]"  Volkswagen, for good reason, demanded adequate assurances of performance from SaarGummi. *See* **Ex. E**.  But SaarGummi has failed to provide any adequate assurances. Therefore, SaarGummi has repudiated the Contract under Tenn. Code Ann. § 47-2-609.

### 3. Injunctive relief is particularly appropriate here in light of the Contract's specific performance provision.

Granting Volkswagen's request for injunctive relief would simply constitute an award of specific performance to which Volkswagen is entitled under the UCC and the Contract.  Under Section 2-711 of the UCC, when a seller has repudiated, the buyer may "in a proper case obtain specific performance." Tenn. Code Ann. § 47-2-711(2)(b).  Specific performance under the UCC is particularly appropriate where the goods contracted for are unique or are in short supply from a limited number of potential sources. *See* Tenn. Code Ann. § 47-2-716(1) ("Specific performance may be decreed where the goods are unique or in other proper circumstances."); *TRW Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002) (affirming preliminary injunction ordering defendant supplier to continue to supply goods where defendant was "sole supplier" of parts to the plaintiff).  As the official comments to this Section of the UCC explain, contracts "involving a particular or peculiarly available source or market" represent "the typical commercial specific performance situation." Tenn. Code Ann. § 47-2-716, Cmt. 2.  A plaintiff buyer's "inability to cover" the goods from another source is also "strong evidence" that specific performance is appropriate. *Id.*

Here, the Parts are unique component parts manufactured only by SaarGummi for Volkswagen's use in assembly operations. (Ver. Compl. ¶ 20; Dec. ¶ 5).  The Parts are not

fungible goods that can be procured from any alternative source, and SaarGummi is aware that Volkswagen has no ready replacement source of supply for these products. (*Id.*)

The Parts also must meet demanding engineering specifications and require extensive certifications and validation for production. (*Id.*; Dec. ¶ 16)  SaarGummi has threatened to cease timely shipment of these unique automotive components, which will inevitably stop assembly at Volkswagen, even though SaarGummi is aware an alternate supplier has not been approved to provide Volkswagen with the Parts. (*Id.* ¶¶ 19-23; Dec. ¶ 18)  Because of these circumstances, SaarGummi expressly agreed that money damages are not an adequate remedy for Volkswagen:

> In any action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies or transition support . . . Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Order and that, in addition to all other rights and remedies that Buyer may have, Buyer shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus Buyer's reasonable attorneys' fees.

(**Ex. B**, Terms and Conditions § 15).

While SaarGummi has resumed temporary shipments of the Parts, each shipment contains only enough Parts to support approximately 1.5 days of vehicle production.  Therefore, without Court-ordered relief, Volkswagen will remain at constant risk of having to shut down its plant.

Thus, due to the unique nature of the Parts, Volkswagen's inability to find a ready replacement for the Parts, and SaarGummi's agreement to ensure that there is no interruption in the supply of Parts, Volkswagen is likely to succeed on the merits of its claim for specific performance.

**B.** **Volkswagen will suffer irreparable injury if SaarGummi is not ordered to perform its contractual obligations.**

Volkswagen will suffer irreparable injury if the Court does not enjoin SaarGummi. The irreparable harm analysis centers on whether the applicant can receive a complete remedy at law. *See Apple Corps. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 349 (M.D. Tenn. 1993). Courts have long recognized the unique aspects of the automotive industry supply chain and the irreparable harm that inevitably will result from a supplier's refusal to deliver components. *See, e.g.*, *TRW*, 4 F. App'x at 401 (holding that the district court did not abuse its discretion in finding irreparable harm and entering a preliminary injunction where automaker could not readily obtain air bags from a second source and further held that plaintiff's goodwill and business reputation would be harmed absent injunctive relief). Typically, in the automotive industry, only minimal inventories are maintained, and deliveries must be made continuously to keep assembly lines operating. *See Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 798 n.7 (E.D. Mich. 1990) ("It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks of parts . . . . A supplier's failure to make scheduled shipments may have immediate and dramatic consequences.").

The failure of a single supplier in an automotive parts supply chain to fulfill its contractual commitments will inevitably cause a ripple effect throughout the chain. Courts have thus often granted preliminary injunctive relief to require component suppliers to continue delivery of parts in order to prevent the irreparable harm that inevitably occurs in the automotive supply chain if there is a refusal to ship. *See, e.g., id.*; *TRW*, 47 F. App'x at 401.

If SaarGummi does not honor its contractual obligations to timely supply the Parts, the resulting harm will be immediate and irreparable. Without continued supply of the Parts, Volkswagen's assembly lines will grind to a halt. (Ver. Compl. ¶ 31; Dec. ¶ 16). The financial

18

impact on Volkswagen will be dramatic, rapidly racking up shutdown damages. (*Id.*). In fact, any delay in the delivery of the Parts, delivery of less than the required contract amount or stoppage in delivery of the same can cause an immediate shutdown of Volkswagen's Assembly Plant, which in turn would lead to substantial losses of revenue—likely millions of dollars per day. (Dec. ¶ 17). Unfortunately, resourcing a new supplier for the Parts would likely take 9 to 12 months if SaarGummi is allowed to stop shipping the Parts in accordance with its contractual obligations. (*Id.*).

The gravity of such harm will be catastrophic. The harm will include, among other things, Volkswagen stopping assembly of vehicles related to the Parts, delaying the launch of Volkswagen's new electric vehicle, the Volkswagen ID.4, and it would be the impetus to having to send up to 3,000 Volkswagen workers home without pay. (Dec. ¶ 18). Volkswagen has also been on a hiring spree to accommodate the labor needs for the production of the Volkswagen ID.4, and if its Assembly Plant is shut down due to SaarGummi's refusal to ship the Parts, that would cause further layoffs and hiring issues. (*Id.*). The negative PR of a shut down would also substantially harm Volkswagen's reputation. (*Id.*). This would also cause further unavailability of vehicles on the market during a time when vehicle supply is already a critical issue in the United States. (*Id.*). Additionally, existing consumers of the Volkswagen Atlas vehicles could also be impacted if those vehicles are in need of repairs involving the Parts SaarGummi supplies. (*Id.*).

Further, if SaarGummi is not enjoined to supply the Parts pursuant to its contractual obligations and to provide adequate assurances, Volkswagen's business reputation and goodwill in the automotive industry will be severely damaged, causing it incalculable and irreparable injury. (Dec. ¶ 19). "The loss of customer goodwill often amounts to irreparable injury because

the damages flowing from such losses are difficult to compute." *Basicomputer Corp.*, 973 F.2d at 512; *accord Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) ("[L]oss of established goodwill may irreparably harm a company.").

The certainty that Volkswagen will suffer immediate and irreparable harm supports entry of injunctive relief. Without prompt issuance of a preliminary injunction, it will be too late to prevent assembly line shutdowns and resulting harms to Volkswagen's goodwill, business relationships, and reputations.

**C.      The balance of harms favors granting injunctive relief.**

In contrast to the potential irreparable harm to Volkswagen, ordering SaarGummi to continue to timely supply the Parts to Volkswagen will merely maintain the *status quo* and require SaarGummi to do nothing more than what it is obligated to do and has been doing for years under the Contract. Thus, the balance of harms tips decisively in favor of granting Volkswagen's motion. *See Memphis Ctr. for Reprod. Health v. Slatery*, 2020 WL 3957792, at *4 (M.D. Tenn. July 13, 2020) ("The balance of relative harms among the parties weighs in favor of Plaintiffs and against Defendants" where the injunction "will preserve the status quo pending a preliminary injunction hearing.").

In the hearing on Volkswagen's Motion for Temporary Injunction, this Court expressed concern over requiring SaarGummi to comply with the Contract in the event SaarGummi was incapable of doing so. Such concern is unwarranted. SaarGummi was able to resume shipment of Parts within hours of being served with Volkswagen's Motion for Temporary Injunction. In addition, in its July 8 letter to Volkswagen, SaarGummi implied that it had successfully renegotiated its contract terms with many of its customers. *See* **Ex. C**. In other words, the issue is not that SaarGummi is *incapable* of meeting its contractual obligations. It just chooses not to do so at the contracted-for price.

**D.    The public interest is served by granting injunctive relief.**

There will be no harm to the public interest if the Court grants Volkswagen's motion and simply requires SaarGummi to live with the same contractual obligations it has operated under for years.  But there will be harm to the public interest if the requested injunctive relief is not granted.  The United States Court of Appeals for the Sixth Circuit has observed that the "[e]nforcement of contractual duties is in the public interest." C*ertified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007); *see also F.S. Sperry Co. v. Schopmann*, 304 F. Supp. 3d 694, 711 (E.D. Tenn. 2018) ("[E]nforcing contractual obligations are public interests that would be furthered by injunctive relief").

The public also has an interest in avoiding supply chain shutdowns. *See, e.g.*, *Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008) (holding that the public interest factor weighed in favor of injunctive relief where compelling seller to supply automotive part would avoid consequential plant shutdowns or layoffs and would avoid economic harm to the state, region, and nation).  SaarGummi's failure to timely deliver the Parts to Volkswagen will likely cause Volkswagen as well as its customers—and potentially other supply chain participants—to shut down production and assembly, potentially causing layoffs and economic harm throughout this automotive supply chain.  The public interest thus weighs heavily in favor of the efficient administration of the automotive industry, and against these potential shutdowns.

**E.    The Court should set the bond amount at $0, or another nominal amount.**

As part of the requested injunctive relief, the Court should require that Volkswagen post a bond of $0 or another nominal amount because an injunction will not harm SaarGummi. "While the Rule 65(c) provides that '[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," . . . "the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security[.]" *Selective Ins. Co. of Am. v. Env't, Safety & Health, Inc.*, 2015 WL 914824, at *10 (E.D. Tenn. Mar. 3, 2015) (quoting Rule 65 and *Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir. 1995)).

A district court may also require no bond where there has been no proof of likelihood of harm. *Skyros, Inc. v. Mud Pie, LLC*, 2016 WL 3165625, at *7 (W.D. Tenn. June 3, 2016); *see also Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 757 (S.D. Ohio 2010) (requiring no bond where it was clear Ohio State University would be able to pay any potential damages awarded against it).  There is no risk of irreparable harm to SaarGummi because Volkswagen will continue to pay SaarGummi for all the Parts shipped.  In this case, it is appropriate to set a $0 or nominal bond amount.

## IV.    CONCLUSION

The four factors required for injunctive relief all weigh heavily in favor of Volkswagen. SaarGummi has unilaterally declared it will cease deliveries in breach of the Contract with no legally legitimate basis.  It has also failed to provide adequate assurances of future performance under the Contract.  For the foregoing reasons, Volkswagen respectfully requests that the Court grant its motion for a Preliminary Restraining Order and enter the proposed Order (submitted via electronic mail to the Court) issuing the Preliminary Restraining Order contained in the proposed Order restraining SaarGummi from terminating its supply of any of the Parts, or taking any action inconsistent with its obligations to timely supply Volkswagen with sufficient quantities of the Parts as ordered by Volkswagen and at the prices set forth in the Contract.

Respectfully submitted,

CHAMBLISS, BAHNER & STOPHEL, P.C.

By:/s/*Timothy M. Gibbons*
    Timothy M. Gibbons, BPR# 014860
    Cathy S. Dorvil, BPR # 034060
    Logan C. Threadgill, BPR# 034470
Liberty Tower
605 Chestnut Street, Suite 1700
Chattanooga, TN 37450
Telephone: (423) 756-3000
Facsimile: (423) 265-9574
Email: tgibbons@chamblisslaw.com
          cdorvil@chamblisslaw.com
          lthreadgill@chamblisslaw.com
*Counsel for Volkswagen Group of America*
*Chattanooga Operations, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2022, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Separate hardcopies of the foregoing were also delivered via FedEx overnight to the following Defendants:

SaarGummi Tennessee, Inc.
c/o Corporation Service Company, Registered Agent
Attn: Bryan Gillit
200 Commerce Way
Pulaski, TN 38478

Pachulski Stang Ziehl & Jones, LLP
Laura Davis Jones
919 North Market Street, 17th Floor
Wilmington, DE 19899
Email: ljones@pszjlaw.com

By: */s/Timothy M. Gibbons*