

# VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS, LLC

**PRODUCTION TERMS AND CONDITIONS OF PURCHASE**

*Effective July 1, 2022*

Exhibit B

# VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS, LLC

## PRODUCTION TERMS AND CONDITIONS OF PURCHASE

*Last revised July 1, 2022*

These Terms apply when referenced by Buyer's purchase order or other documentation.

1. <u>Offer; Acceptance; Exclusive Terms; Identity of Buyer.</u> Each purchase order or purchase order revision ("P.O.") issued by Buyer is an offer to the seller identified on the order (the "Seller") for the purchase of goods and/or services (collectively, "Supplies") and includes and is governed by these Terms and Conditions of Purchase, (collectively, "Terms"). The term "Order" as used in these Terms is defined as the collective set of documents identified in Section 2 below. For purposes of these Terms, "Supplies" shall also include replacement or service parts purchased by Buyer following the end of series production for a vehicle or program, including, without limitation, Volkswagen Original Parts®, Audi Original Parts®, Seat Original Parts®, and Skoda Original Parts®. When accepted, the Order supersedes all prior agreements, purchase orders, quotations, proposals and other communications regarding the Supplies covered by the Order, except that the documents provided by Buyer with the request for quote for the Supplies including, but not limited to, the drawings, data, technical information and statement of work (Lastenheft) (the "RFQ Documents") and a prior agreement signed or electronically accepted by an authorized representative of Buyer (a "Prior Agreement", such as a nomination letter or Non-Disclosure Agreement (but not prior purchase orders for the same parts and vehicle program)) will continue to apply as part of the Order. Material Releases (as defined in Section 4 of these Terms) are included as part of the Order, are governed by these Terms and are not independent contracts. Seller accepts the Order, including these Terms, and forms a contract by doing any of the following: (a) commencing any work under the Order; (b) accepting the Order in writing; (c) electronically accepting the Order; or (d) any other conduct that recognizes the existence of a contract with respect to the subject matter of the Order. **THE ORDER IS LIMITED TO AND CONDITIONAL UPON SELLER'S ACCEPTANCE OF THESE TERMS EXCLUSIVELY.** The Order does not constitute an acceptance of any offer or proposal made by Seller. Any reference in the Order to any offer or proposal made by Seller is solely to incorporate the description or specifications of Supplies in the prior proposal, but only to the extent that the description or specifications do not conflict with the description and specifications in the Order. Any additional or different terms proposed by Seller, whether in Seller's quotation, acknowledgement, invoice or otherwise, shall be deemed a material alteration of these Terms, and are hereby objected to and rejected by Buyer, provided, that any such proposal or attempted variance shall not operate as a rejection of this Order if Seller accepts Buyer's offer by commencement of work, shipment of the Supplies, acceptance of the Order in writing or by other means acceptable to Buyer, in which case this Order shall be deemed accepted by Seller without any additional or different terms or variations whatsoever. Any modification of these Terms must be expressly stated in the Order. Each Order can be modified only under Section 42. References herein to "including" shall be deemed to mean "including, but not limited to," or "including, without limitation" or such similar meaning.

2. <u>Precedence of Documents</u>. In the event of a conflict, the electronic Nomination Agreement ("eNA") shall take precedence over these Terms, and these Terms shall take precedence over the P.O., and the P.O. shall take precedence over the RFQ Documents. The final document in order of precedence shall be the submitted response or bid of the Supplier.

3. <u>Time Period of Order.</u> Subject to Buyer's termination rights, the agreement formed by the Order is binding on the parties for the length of the applicable vehicle program production life, and both Buyer and Seller acknowledge the risk of the vehicle program production life being cancelled or extended by Buyer. Notwithstanding the foregoing, if an expiration date is stated in the Order, the term of the Order will continue until that date. Unless specifically waived in writing by an authorized representative of Buyer, Seller's obligations with respect to service and replacement parts will survive the termination or expiration of the Order as set forth in Section 14 below.

4. <u>Quantity; Material Releases; Delivery.</u> (a) Unless noted as "firm" or words of similar meaning, quantities listed in each Order are Buyer's best estimate of the quantities of Supplies it might purchase from Seller for the contract

2
PUBLIC DOCUMENT                                                                                                                          Rev. July 1, 2022
Case 1:22-cv-00191-CEA-CHS   Document 23-2   Filed 07/27/22   Page 2 of 20   PageID #: 1202

term specified in the Order. Any estimates or forecasts of production volumes or program duration are subject to change from time to time, with or without notice to Seller, and shall not be binding upon Buyer. Unless otherwise expressly stated in the Order, Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, whether express or implied, to Seller in respect of Buyer's quantitative requirements for the Supplies or the term of supply of the Supplies. (b) Unless otherwise expressly stated in the Order, the RFQ Documents or a Prior Agreement, if no other quantity is stated on the face of the Order or if the quantity is blank or states the quantity as zero, "blanket," "see release," "as scheduled," "as directed," "subject to Buyer's production releases" or similar terms, then Seller will supply Buyer's requirements for Supplies in such quantities as identified by Buyer as firm orders in material authorization releases, manifests, broadcasts or similar releases ("Material Releases") that are transmitted to Seller during the term of the Order, and Seller will supply all such Supplies on such dates and times, at the price and on the other terms specified in the Order. If the Order covers services, Buyer is required to purchase such services to the extent expressly stated in a Statement of Work ("SOW") or a Statement of Requirements ("SOR") prepared by Buyer. Buyer may require Seller to participate in electronic data interchange or a similar inventory management program, at Seller's expense, for notification of Material Releases, shipping confirmation and other information. Material Releases are part of the Order, are governed by these Terms and are not independent contracts. Seller accepts the risk associated with lead times of various raw materials and/or components if they are beyond those provided in Material Releases. (c) Time and quantities are of the essence under the Order. Seller agrees to 100% on-time delivery of the quantities and at the times specified by Buyer, as stated in the Order and related Material Releases. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which entitles Seller to modify the price for Supplies. Buyer is not obligated to accept early deliveries, late deliveries, partial deliveries or excess deliveries. Unless otherwise agreed in writing by Buyer, title and the risk of loss passes from Seller to Buyer upon delivery to Buyer's transportation carrier (or if shipment is by Seller or common carrier, then upon delivery to Buyer's designated facility). (d) To assure the timely delivery of Supplies, Seller will, upon written request from Buyer, manufacture Supplies in excess of Buyer's current Orders to serve as a reserve for shipment, at such inventory reserve level as may be set by Buyer from time to time, to meet Buyer's requirements and to meet any unforeseen delays due to any reason whatsoever. Until such reserve Supplies are purchased by Buyer from Seller, they shall remain the property of Seller, and shall be held by Seller at its sole risk and expense. (e) Seller shall at all times maintain sufficient capacity to ensure the timely delivery of those quantities of Supplies ordered by Buyer. Changes in quantity including, but not limited to, variances from Buyer's estimates shall not entitle Seller to modify the price for Supplies.

5. <u>Invoicing and Pricing: Freight.</u> (a) Except as expressly stated on the Order, the price of Supplies stated on the Order is complete and includes storage, handling, packaging and all other expenses and charges of Seller, and no surcharges, premiums or other additional charges of any type shall be added without Buyer's express written consent. All invoices shall be precisely itemized including a unique description or other clear identifier of the materials provided; and if labor is invoiced Seller shall provide the name of the employee(s) who worked, the specific hours worked, as well as the dates and times the employee(s) worked. If the invoice is not itemized, or enough information is not provided, the invoice is not payable until all information is provided to Buyer. Unless otherwise stated in the Order, Incoterms 2010 will apply to all shipments. Except as otherwise stated in the Order, the RFQ Documents, or a Prior Agreement, shipments of Supplies within the USMCA region will be FCA destination point. Except as otherwise stated in the Order, the RFQ Documents, or a Prior Agreement, shipments of Supplies outside the USMCA region will be DAP Buyer's designated facility at Seller's final production location, using Buyer's transportation. Prices are not subject to increase, unless specifically stated in the Order, the RFQ Documents, or a Prior Agreement, and Seller assumes the risk of any event or cause affecting prices, including without limitation, foreign exchange rates, increases in raw material costs, inflation, increases in labor and other production and supply costs and any other event which impacts the price or availability of materials or supplies. (b) All invoices or related documents for the Supplies must reference the Order number, amendment or release number, Buyer's part number, Seller's part number where applicable, quantity of pieces in the shipment, number of cartons or containers in the shipment, bill of lading number, country of origin, Seller's name and address, consignee name and address, delivery name and address, currency, and other information required by Buyer with such information provided in the English language. No invoice or related documents may reference any term separate from or different than these Terms or the terms that appear on the face of the Order. Buyer reserves the right to return all invoices or related documents submitted incorrectly. (c) Seller agrees to accept payment for the Supplies based on Buyer's Evaluated Receipt Record/Self Billed Invoice. (d) The total price includes all duties and taxes except for any governmentally imposed value added tax (VAT) imposed by a non-USA jurisdiction, which must be shown separately on Seller's invoice or billing documentation for each shipment. Buyer is not responsible for any

business activity taxes, payroll taxes, or taxes on Seller's income or assets. In addition, the Supplies may be exempt from sales taxes as further provided in Section 36. Seller shall pay all premium freight costs over normal freight costs if Seller needs to use an expedited shipping method to meet agreed delivery dates due to its own acts or omissions. Seller shall pay any costs incurred by Buyer as a result of Seller's failure to comply with shipping or delivery requirements. (e) Seller represents and warrants that the prices are, and will remain, no less favorable to Buyer than any price which Seller presently, or in the future, offers to any other customer for the same or substantially similar goods and/or services for substantially similar quantities. If Seller offers a lower price for the same or substantially similar goods and/or services to any other customer during the term of the Order, then Seller will immediately offer Buyer the same price as offered to Seller's other customer.

6. <u>Packaging; Marking; Shipping; Disclosure; Special Warnings or Instructions.</u> (a) Seller shall: (i) properly pack, mark, and ship Supplies in packaging approved by Buyer and otherwise according to the instructions and requirements of Buyer, the involved carriers and the country of destination; (ii) route the shipments according to Buyer's instructions including, without limitation, to third parties if so directed by Buyer; (iii) label or tag each package according to Buyer's instructions; (iv) provide papers with each shipment showing the Order number, amendment or release number, Buyer's part number, Seller's part number (where applicable), number of pieces in the shipment, number of containers in the shipment, Seller's name and number, and the bill of lading number; and (v) promptly forward the original bill of lading or other shipment receipt for each shipment according to Buyer's instructions and carrier requirements. (b) Seller shall promptly provide Buyer with the following information in the form requested by Buyer: (i) a list of all ingredients in Supplies; (ii) the amount of all ingredients, and (iii) information concerning any changes in or additions to the ingredients. Before and at the time Supplies are shipped, Seller will give Buyer sufficient warning in writing (including appropriate labels on all Supplies, containers, and packing, including without limitation disposal and recycling instructions, material safety data sheets and certificates of analysis) of any hazardous or restricted material that is an ingredient or part of the Supplies, containers or packaging, together with any special handling instructions that are needed to advise carriers, Buyer, and their respective employees how to take appropriate measures while handling, transporting, processing, using or disposing of the Supplies, containers, and packing to best prevent bodily injury or property damage. Seller agrees to comply with all national, state, provincial, and local laws and regulations pertaining to product content and warning labels, including without limitation the U.S. Toxic Substances Control Act and European Union Directive 2000/53/EC. (c) Seller shall reimburse Buyer for any liabilities, expenses and costs incurred as a result of improper packing, marking, routing, or shipping or any other noncompliance with the requirements of this Section. In no event will shipping documents attached to or contained in the shipment display pricing information or any of Buyer's proprietary information. All applicable documents for logistics processes archived on the B2B Platform/LISON will apply and Seller will comply therewith. (d) Seller shall mark all replacement or service parts with the appropriate brand and/or logo and country of origin, in accordance with Buyer's instructions. In addition to Seller's other requirements, Seller shall promptly respond to requests from Buyer relating to content, origin of content or otherwise relating to the Supplies or any information relating to conflicts minerals.

7. <u>Customs; Related Matters.</u> Credits or benefits resulting from the Order, including trade credits, export credits or the refund of duties, taxes, or fees, belong to Buyer. Seller will provide all information and certificates (including FTA certificates and USMCA Certificates of Origin) necessary to permit Buyer to receive these benefits or credits. Seller agrees to fulfill any customs or FTA related obligations, origin marking or labeling requirements, and local content origin requirements. Export licenses or authorizations necessary for the export of Supplies are Seller's responsibility unless otherwise stated in the Order, the RFQ Documents, or a Prior Agreement, in which case Seller shall provide the information necessary to enable Buyer to obtain the licenses or authorizations. Seller shall promptly notify Buyer in writing of any material or components used by Seller in filling the Order that Seller purchases in a country other than the country in which the Supplies are delivered. Seller shall furnish any documentation and information necessary to establish the country of origin or to comply with the applicable country's rules of origin requirements. Seller shall promptly advise Buyer of any material or components imported into the country of origin and any duty included in the Supplies' purchase price. If Supplies are manufactured in a country other than the country in which Supplies are delivered, Seller shall mark Supplies "Made in [country of origin]." Seller shall provide to Buyer and the appropriate governmental agency the documentation necessary to determine the admissibility and the effect of entry of Supplies into the country in which Supplies are delivered. Seller warrants that any information that is supplied to Buyer about the import or export of Supplies is true and that all sales covered by the Order shall be made at not less than fair value under the anti-dumping laws of the countries to which the Supplies are exported. To the extent any Supplies covered by this Order are to be imported into the United States of

America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative and shall provide any supporting documentation requested by Buyer and/or the Bureau of Customs and Border Protection. Seller shall notify Buyer in writing of any Supplies subject to U.S. export laws and regulations including any changes to local or USMCA content, which in each case are subject to Buyer approval.

8. <u>Inspection; Non-Conforming Goods/Services; Audit.</u> Buyer, or its chosen and designated representative, may enter Seller's facility to inspect the facility, Supplies, materials, and any of Buyer's property related to the Order. Buyer's inspection of Supplies, whether during manufacture, prior to delivery, or within a reasonable time after delivery, does not constitute acceptance of any work-in-process or finished goods. For further clarification, Buyer may, but is not required to, inspect Supplies. Buyer's acceptance, inspection, or failure to inspect does not relieve Seller of any of its responsibilities or warranties. Nothing in the Order releases Seller from the obligation of testing, inspection, and quality control. If defective Supplies are shipped to and rejected by Buyer, the quantities under the Order will be reduced unless Buyer otherwise notifies Seller. Seller will not replace reduced quantities without a new Material Release from Buyer. In addition to other remedies available to Buyer: (i) Seller agrees to accept return, at Seller's risk and expense at full invoice price, plus transportation charges, and to replace defective Supplies as Buyer deems necessary; (ii) Buyer may have corrected at any time prior to shipment from Buyer's plant Supplies that fail to meet the requirements of the Order; and/or (iii) Seller shall reimburse Buyer for all reasonable expenses that result from any rejection or correction of defective Supplies, including without limitation sorting by Buyer of defective Supplies. Seller shall document corrective actions within a commercially reasonable period after receipt of a defective sample and will take any measures necessary to correct the defect. Payment for nonconforming Supplies is not an acceptance, does not limit or impair Buyer's right to assert any legal or equitable remedy, and does not relieve Seller's responsibility for latent or other defects. Upon reasonable written notice to Seller, Buyer may conduct audits at Seller's production facility for the purpose of quality, cost or delivery verification. Seller will ensure that the terms of its contracts with its sub-suppliers and subcontractors provide Buyer with all of the rights specified in this Section.

9. <u>Payment.</u> Buyer will pay for Supplies on the payment terms stated in the Order, the RFQ Documents, or a Prior Agreement, if any. Such payment terms apply to the date Supplies are received at the facility designated by Buyer or, in the case of services, the date following completion of the services. If no payment term appears on the Order, the RFQ Documents, or in a Prior Agreement, Buyer will pay Seller for the Supplies on the date established by Buyer's Multilateral Netting System (MNS2) which provides, on average, that payment shall be made Net 60 of Buyer's receipt of Supplies at Buyer's designated facility or, in the case of services, Buyer's receipt of Seller's invoice following completion of the services. Invoices for Tooling must be issued only as approved, as provided in the Order. Buyer may withhold payment pending receipt of evidence, in the form and detail requested by Buyer, of the absence of any liens, encumbrances, or claims on Supplies provided under the Order. Payment will be made in the currency expressly stated in the Order; if no such currency is noted, payment will be made in U.S. Dollars. Payment will be made by bank transfer or by check mailed on or before the due date unless otherwise expressly agreed by Buyer, and Seller agrees to accept payment by electronic funds transfer.

10. <u>Changes.</u> (a) Buyer reserves the right at any time, by written notice to Seller, to make changes, or to require Seller to make changes, to drawings, specifications, sub-suppliers, subcontractors, samples or descriptions of Supplies. Buyer also reserves the right to otherwise change the SOW covered by the Order, including work with respect to such matters as inspection, testing, or quality control. Buyer may also direct the supply of raw materials from itself or from third parties at any time during the term. Seller shall promptly make any such requested change and request a reasonable difference in price, if there is one. In order for Seller to request a reasonable difference in price or time for performance as a result of such a change, Seller must notify Buyer of its request in writing within ten calendar days after receiving written notice of the change. Buyer can request additional documentation from Seller relating to any change in specifications, price, or time for performance. After receiving all requested documentation, Buyer may, in its sole discretion, equitably adjust the price or time for performance. **IF SELLER DOES NOT PROVIDE THE TIMELY WRITTEN NOTICE REQURIED ABOVE TO BUYER THAT A REQUESTED CHANGE MAY RESULT IN A DIFFERENCE IN PRICE OR TIME FOR PERFORMANCE, BUYER'S REQUESTED CHANGE SHALL NOT AFFECT THE PRICE OR TIME FOR PERFORMANCE.** (b) Seller shall not make any change relating to Supplies, including without limitation, in the Supplies' contents, design, specifications, processing, packing, marking, shipping, price, place of manufacture,

or date or place of delivery, except at Buyer's written instruction or with Buyer's written approval. Such prohibited changes include, without limitation, changing (i) any sub-supplier or subcontractor to Seller of the services, raw materials, or goods used by Seller in connection with its performance under the Order, (ii) the location of any facility from which Seller and/or any such sub-supplier or subcontractor operates and that relates in any way to the Supplies, or to services, raw materials, or goods used by Seller in connection with performance under the Order, (iii) the price of any Supplies covered by the Order, (iv) the nature, type or quality of any services, raw materials or goods used by Seller or its third party sub-suppliers or sub-contractors in connection with the Order, (v) the fit, form, function, appearance or performance of any Supplies covered by the Order, or (vi) the production method, or any process or software, or any production equipment used in the production or provision of, or as part of, any Supplies under the Order. Any changes by Seller to any Order or to the Supplies covered by the Order without the prior written approval of an authorized representative of Buyer shall constitute a breach of the Order.

11. <u>Warranties.</u> (a) Seller expressly warrants and guarantees to Buyer, to Buyer's successors and assigns, and to users of Buyer's products, that all Supplies delivered or provided to Buyer will: (i) be competitive in terms of price, quality, delivery and technology, and conform to the specifications, standards, drawings, samples, descriptions and revisions as furnished to or by Buyer; (ii) conform to all applicable laws, orders, regulations, and standards in countries where Supplies or vehicles or other products incorporating Supplies are to be sold, including without limitation the National Traffic and Motor Vehicle Safety Act, United States motor vehicle safety standards, the Toxic Substances Control Act, and European Union Directive 2000/53/EC; (iii) be merchantable and free of defects in design (to the extent designed by Seller or any of its subcontractors, agents or sub-suppliers, even if the design has been approved by Buyer), materials and workmanship; (iv) be selected, designed (to the extent designed by Seller or any of its subcontractors, agents or sub-suppliers, even if the design has been approved by Buyer), manufactured and assembled by Seller based upon Buyer's stated use and be fit and sufficient for the purposes intended by Buyer, and (v) be free of all liens, claims and encumbrances whatsoever. Seller further expressly warrants that, unless otherwise expressly stated in the Order, the Supplies are newly manufactured entirely with new materials, none of the Supplies is, in whole or in part, governmental or commercial surplus, and the Supplies are free from latent defects or conditions that would give rise to a defect regardless of whether the defect or condition was known or discoverable during the warranty period. These warranties are intended to provide Buyer with protection from any and all warranty claims brought against Buyer by its end-users. The foregoing warranties are in addition to those available to Buyer by law. (b) The warranty period begins the date when the Supplies are delivered to Buyer (or as directed by Buyer) and expires on the later of (i) three years from the date of such delivery of Supplies; (ii) the expiration of the warranty period provided by applicable law; or (iii) the expiration of the warranty period offered by Buyer to its end-users for Supplies installed on or as part of vehicles beginning when the vehicle is placed in service; and provided further, that if Buyer voluntarily or pursuant to a government mandate, makes an offer to owners of vehicles (or other finished products) on which the Supplies, or any parts, components or systems incorporating the Supplies are installed, to provide remedial action or to address a defect or condition that relates to motor vehicle safety or the failure of a vehicle to comply with any applicable law, safety standard or corrective service action ("Remedial Action" or "Recall Campaign"), the warranty shall continue for such period of time as may be deemed necessary by Buyer or dictated by the federal, state, local or foreign government where the Supplies are used or provided. (c) For all services, Seller further warrants that its work will be performed in a professional and workmanlike manner, consistent with all standards and specifications agreed on with Buyer and otherwise consistent with industry standards. (d) Seller shall immediately notify Buyer in writing when it becomes aware of any ingredient, component, design or defect in Supplies that is or may become harmful to persons or property. (e) Buyer's approval of any design, drawing, material, process or specifications shall not relieve Seller of these warranties. (f) The following communications shall each constitute notice of a breach of warranty under the Order: (i) any written communication specifying a defect, default, claim of defect, or other problem or quality issue of the Supplies provided under the Order; (ii) any written communication to Seller claiming that the Supplies are in breach of any warranty, or that Seller is in default under the Order; and (iii) a written termination notice from Buyer under Section 20. Any such claim by Buyer of breach may only be rescinded in writing by an authorized representative of Buyer.

11.1 <u>OFAC Compliance</u>. Seller warrants that it is currently in compliance with, and shall at all times during the term of this Agreement remain in compliance with, the regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other

governmental action relating thereto. In addition, Seller shall ensure that its suppliers, sub-suppliers, and sub-sub suppliers are also in compliance with these requirements and shall remain so during the term of this Agreement, so that no component or sub-component of an item purchased by Buyer from Seller is in violation of OFAC regulations

12. <u>Supplier Standards, Quality and Development; Required Programs.</u> (a) Seller shall conform to Buyer's quality control and other standards and inspection systems, including, without limitation, Buyer's Formula Q Concrete, Formula Q Capability, Formula Q New Parts Integral, Quality Documentation for the Pre-Series Phase, Quality Master Agreement for Commissioning Suppliers for Module and Systems Assembly, Agreement on Objectives Regarding Quality Capability and VDA 6.1 (collectively, Buyer's "Supplier Standards"). Seller shall also participate in supplier quality and development programs of Buyer. Seller agrees to meet the full requirements of Formel-Q and Qualification for New Parts (QPN), as specified by Buyer and agrees to present this information to Buyer upon request, at the level requested. Seller shall also participate in and comply with the following Buyer programs and standards: (i) Development Conditions VW 99000; (ii) the Supplier Claims Manual; (iii) Advanced Quality Planning (QPN); (iv) supplier performance evaluations; (v) Supplier Packaging Regulations; (vi) Standardized Expendable Packaging document (found on LISON); (vii) Code of Conduct for Business Partners; and (viii) Appendix G - Supplier Diversity Program. For aftersales and service parts, Seller shall also participate in and comply with the following Buyer programs and standards: (i) Service Parts Requirement's Manual; and (ii) Service Parts Supplier Claims Manual. In the event of any discrepancy between any part of the above programs or standards and an express provision of these Terms, these Terms shall control. (b) Seller shall ensure that all its subcontractors and sub-suppliers of goods or services comply with the provisions of this Section. (c) With respect to Supplies that have been specially marked, (e.g. with the letter "D" or "TLD" in the technical specifications pertaining to such Supplies or by separate agreement), Seller shall also maintain special records showing when, in what manner, and by whom the delivery items were tested and inspected with respect to features requiring documentation, and recording the results of the required quality testing. The testing and inspection documentation must be retained for fifteen (15) years and provided to the Buyer when requested. The Seller shall ensure its subcontractors and sub-suppliers also comply with the foregoing provisions. For guidance on this issue, see the VDA publication *Nachweisfuhrung- Leitfaden zur Dokumentation and Archivierung von Qualitatsforderungenl* Quality Evidence- Guidelines for the Documentation and Archiving of Quality Requirements, Frankfurt am Main, 1998. (d) Seller must maintain adequate development, validation, launch, and ongoing supervision to assure all Supplies provided to Buyer conform to all applicable warranties and other provisions of the Order.

13. <u>Buyer and Volkswagen Group Standards for Sustainable Development</u>. In addition to Seller's conformance with Buyer's other requirements, Seller will conform to Buyer's and Volkswagen Group's requirements for sustainable development with regard to relationships with business partners (see Code of Conduct for Business Partners on www.vwgroupsupply.com). The requirements for sustainable development define the expectations of Buyer and Volkswagen Group regarding sustainable conduct by business partners involved in the added value of their products. The full text of the requirements can be found on vwgroupsupply.com under Cooperation -> Sustainability. When you submit an offer to Buyer or complete an order, you confirm your awareness of the requirements for sustainable development.

14. <u>Service and Replacement Parts.</u> During the applicable vehicle program production life and for five (5) years after a vehicle design concludes production or a specific part concludes production (unless a different period is agreed in writing by the parties or stated in Buyer's applicable Statement of Work or Supplier Standards), Seller will supply Buyer's written "replacement parts" and "service parts" orders for the same Supplies, component parts and materials at the price(s) set forth in the Order plus any actual cost differential for special packaging. If the Supplies are systems or modules, Seller will sell each component or part at a price that does not, in the aggregate, exceed the system or module price specified in the Order, less assembly costs, plus any actual cost differential for packaging. For an additional ten (10) years beyond the first five year period above, (or a different period if agreed in writing by the parties or stated in Buyer's applicable Statement of Work or the Supplier Standards), Seller will sell Supplies to Buyer in order to fulfill Buyer's past model service and replacement parts requirements, at price(s) based on the most recent price(s) under the Order, taking into account actual, documented differences in the cost of materials, packaging, and costs of production after any of Buyer's current model purchases have been completed, as mutually and reasonably agreed by the parties. This additional ten (10) year requirement is meant to ensure Supplier's compliance with the requirements of the Terms and Conditions of Supply of Volkswagen Original Parts® agreement. At Buyer's request, Seller will provide a list of the individual components or parts in such system

or modules, identify any subcontractors or sub-suppliers of such individual components or parts and the price paid for each and will make service literature and other materials available at no additional charge to support Buyer's service part sales activities. Unless otherwise expressly agreed in writing by an authorized representative of Buyer, or unless Buyer removes Tooling from Seller necessary for the production of service parts, Seller's obligations under this Section 14 shall survive termination or expiration of the Order for any reason. Buyer's Terms shall apply to and govern all of Buyer's orders for replacement and service parts made pursuant to this Section 14.

15. <u>Remedies.</u> The rights and remedies reserved to Buyer in each Order will be cumulative with and in addition to all other or legal or equitable remedies. Seller will reimburse Buyer for any incidental, consequential or other damages (including lost profits, lost fees, lost business, loss of use and costs associated with business interruptions) arising out of Seller's breach or by nonconforming Supplies, including without limitation costs, expenses and losses incurred directly or indirectly by Buyer: (i) in inspecting, sorting, storing, reworking, repairing or replacing the nonconforming Supplies; (ii) resulting from production interruptions; (iii) conducting recall campaigns, customer field service actions or other corrective service actions; (iv) resulting from lost vehicles due to nonconforming Suppliers; or (v) resulting from personal injury (including death) or property damage. Buyer's damages include without limitation reasonable attorneys' fees and other professional fees, settlements and judgments incurred by Buyer and other costs associated with Buyer's administrative time, labor and materials. Seller shall abide by the Supplier Claims Manual for the administration or processing of warranty charge-backs for nonconforming Supplies, and will participate in and comply with warranty reduction or related programs of Buyer that relate to the Supplies. In any action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies or transition support, or for possession of property, Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Order and that, in addition to all other rights and remedies that Buyer may have, Buyer shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus Buyer's reasonable attorneys' fees.

16. <u>Compliance with Laws; Ethics.</u> (a) Seller, including all Seller personnel, sub-suppliers, subcontractors, and affiliates, and any Supplies supplied by Seller, are in compliance with and will comply with all applicable laws, including rules, regulations, orders, conventions, ordinances and standards, including without limitation (i) in relation to the manufacture, labeling, transport, import, export, licensing, permitting, approval or certification of the Supplies, and (ii) laws relating to environmental matters, hiring, wages, hours and conditions of employment, immigration, worker documentation and permits, international prohibitions on child labor, sub-supplier or subcontractor selection, discrimination, occupational health or safety, and motor vehicle safety. The Order incorporates by reference all clauses required by these laws. (b) All materials used by Seller in the Supplies or in their manufacture will satisfy the then existing governmental and safety constraints on restricted, toxic and hazardous materials as well as environmental, electrical and electromagnetic considerations that apply to the country of manufacture, sale, or destination. (c) Seller and its employees, sub-suppliers and subcontractors will abide by the highest ethical standards. Neither Seller nor any of its personnel, sub-suppliers, subcontractors, or affiliates will utilize slave, child, prisoner, or any other form of forced, involuntary, or illegal labor, or engage in abusive worker treatment or corrupt business practices in the sale of Supplies or provision of Services under these Terms. At Buyer's request, Seller shall certify Seller's and its sub-suppliers', subcontractors' and affiliates' compliance with the foregoing, provide documentation as requested that supports the foregoing, and Buyer reserves the right to check at any time the qualifications and performance of any personnel of Seller or its subcontractors.

17. <u>Indemnification.</u> (a) To the fullest extent permitted by law, (i) Seller hereby assumes the entire, sole responsibility for any injury to person, including death, or damage to property of any kind or nature caused by, resulting from, or in connection with the furnishing of Supplies by Seller, its sub-suppliers, subcontractors, officers, agents or employees; (ii) Buyer shall not be responsible for any injury to person (including death) or damage to property resulting from Seller's possession, use, misuse or failure of any Buyer's Property or other property furnished to Seller by Buyer, and the use of any such property by Seller shall constitute acceptance by Seller of all responsibility for any claims for such injury or damage, and (iii) Seller will defend, indemnify and hold harmless Buyer, its dealers and users of the products sold by Buyer (or the vehicles in which they are incorporated) and all of their respective agents, customers, invitees, subsidiaries, affiliates, successors and assigns, against all damages, losses, claims, liabilities, and expenses (including reasonable attorneys' and other professional fees, settlements, and judgments) arising out of or resulting from (a)(i) or (ii) or otherwise from any defective Supplies, or from any negligent or wrongful act or omission of Seller or Seller's agents, employees, sub-suppliers, or subcontractors, or any breach or

failure by Seller to comply with any of Seller's representations or other terms and conditions of an Order (including any part of these Terms) including, without limitation, the cost of recall campaigns, Buyer field service actions or other corrective service actions that, in Buyer's reasonable judgment, are required because of nonconformities in some or all of the Supplies provided by Seller hereunder, and including without limitation interim set-offs or charges (such as interim field service action cost recovery debits) attributable to Supplies but subject to adjustment based on final determination of whether and to what extent the damages, losses, claims, demands, liabilities, and expenses were attributable to defects or other failures of Supplies or Seller to comply with its obligations under one or more Orders. Seller's obligation to defend and indemnify under this Section will apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability, or otherwise except for claims that arise as a result of the sole negligence of Buyer. Buyer has the right to be represented by and actively participate through its own counsel in the defense and resolution of any indemnification matters, at Seller's expense. The indemnification obligations of Seller, including, but not limited to, under this Section, are independent of and in addition to any insurance and warranty obligations of Seller. (b) If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises: (i) Seller will examine the premises and property to determine whether they are safe for the requested work and will advise Buyer promptly of any situation it deems to be unsafe; (ii) Seller's employees, sub-suppliers, subcontractors, and agents will comply with all laws and regulations that apply to the premises and property and may be removed from Buyer's premises at Buyer's discretion; (iii) Seller's employees, sub-suppliers, subcontractors, and agents will not possess, use, sell, transfer or be under the influence of alcohol or unauthorized, illegal, or controlled drugs or substances on the premises or while using the property; and (iv) to the fullest extent permitted by law, Seller will defend, indemnify, and hold harmless Buyer and its agents, customers, invitees, subsidiaries, affiliates, successors, and assigns, against all damages, losses, claims, demands, liabilities and expenses (including reasonable attorneys' and other professional fees, settlements, and judgments) arising out of or resulting from damages to the property of or personal injuries (including death) to Buyer, its employees or agents, or any other person or entity to the extent arising from or in connection with Seller's work on the premises or Seller's use of Buyer's property, except for any liability, claim or demand arising out of the sole negligence of Buyer.

18. <u>Insurance</u>. Seller will obtain and maintain, with insurance companies acceptable to Buyer, the insurance coverage listed below or in additional amounts and coverages as may be requested by Buyer, in each case naming Buyer and its affiliates (as applicable) as loss payee(s) and "additional insured(s)." Such coverages shall include, without limitation, providing full fire and extended coverage insurance for the replacement value of (i) all Seller's Property, and (ii) any bailed Buyer's Property, both for their full replacement value. Seller shall furnish to Buyer a certificate showing compliance with this requirement or certified copies of all insurance policies within 10 days of Buyer's written request. It is required, and the certificate and policies will provide, that Buyer will receive 30 days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Without limiting the generality of the rights and remedies available to Buyer, it shall be a condition precedent to Buyer's obligation to pay Seller that Buyer shall have timely provided the certificate or certified copies of insurance policies as required by this Section. The existence of insurance does not release Seller of its obligations or liabilities under the Order. Minimum required coverage is as follows:

| COVERAGE | LIMITS OF LIABILITY |
|---|---|
| Workers compensation | Statutory |
| Employer's liability | US$500,000 / each accident, disease policy limit, disease each employee |
| Comprehensive general liability insurance, including contractual liability coverage | US$5,000,000 / each occurrence, general aggregate, products & completed operations aggregate |
| Comprehensive automobile liability insurance | US$5,000,000 / each occurrence, combined single limit |

| | |
|---|---|
| Business interruption insurance | US$2,500,000 / each occurrence |

19.     Financial Review; Insolvency.  (a) Buyer or a third party designated by Buyer may at any time review the financial condition of Seller and its affiliates, and Seller will fully cooperate in such review and will promptly provide copies of or access to requested documents, including, without limitation, financial records and statements, forecasts, business plans, banking contacts, and loan documents, and will make its financial managers available for discussions during reasonable business hours.  Buyer and any designated third party will keep confidential any confidential information about Seller obtained in a financial review and use such information only for purposes of the review, except as needed to enforce any order or agreement.  For purposes of this Section, confidential information about Seller shall not include any information (i) that is public, (ii) that Buyer can establish by written documentation was properly in its possession prior to the financial review, (iii) that was independently developed by Buyer without use of or reference to Seller's confidential information, (iv) that constitutes information unrelated to Seller's financial information, but otherwise relating to the Supplies, the Order, or Buyer or (v) that is disclosed pursuant to law, regulation or lawful order or process.  In the event of (v) (information that is disclosed pursuant to law, regulation or lawful order or process), Buyer shall promptly notify Seller of the disclosure requirement to permit Seller to oppose or limit such disclosure.  (b) The Order may be terminated immediately by Buyer without liability to Seller if any of the following or comparable events occur, and without limiting Buyer's rights and remedies, Seller will reimburse Buyer for all costs incurred by Buyer in connection with any of the following, including without limitation attorneys' and other professional fees:  (i) Seller becomes insolvent; (ii) Seller files a voluntary petition in bankruptcy; (iii) an involuntary petition in bankruptcy is filed against Seller; (iv) a receiver or trustee is appointed for Seller; (v) Seller needs accommodations from Buyer, financial or otherwise, in order to meet its obligations under the Order; (vi) Seller executes an assignment for the benefit of creditors; or (vii) Seller is unable promptly to provide Buyer with adequate reasonable assurance of Seller's financial capability to perform any of Seller's obligations under the Order on a timely basis.  In the event that this Order is not terminated in accordance with the immediately preceding sentence, upon the occurrence of an event described in the immediately preceding sentence, Buyer may make equitable adjustments in the price, payment terms, and/or delivery requirements under this Order as Buyer deems appropriate to address the change in Seller's circumstances, including Seller's continuing ability to perform its obligations regarding warranty, nonconforming Supplies, or other requirements under this Order. (c) Seller agrees that if Seller experiences any delivery or operational problems, Buyer may, but is not required to, designate one or more representatives to be present in Seller's applicable facility to observe Seller's operations.  Seller agrees that if Buyer provides to Seller any accommodations (financial or other) that are necessary for Seller to fulfill its obligations under this Order, Seller will reimburse Buyer for all costs, including attorneys' and other professionals' fees, incurred by Buyer in connection with such accommodation and will grant access to Buyer to use Seller's premises and machinery, equipment, and other property necessary for the production of the Supplies covered by this Order.

20.     Termination for Breach or Nonperformance.  (a) Buyer may terminate all or any part of the Order, without liability to Seller, if Seller: (i) repudiates, breaches or threatens to breach any of the terms of the Order (including without limitation Seller's warranties and quality supplier provisions); (ii) fails or threatens not to deliver Supplies or perform services in connection with the Order; (iii) fails to make progress or to meet reasonable quality requirements so as to endanger timely and proper completion or delivery of Supplies and does not correct the failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying the failure or breach; (iv) enters or offers to enter into a transaction that includes a sale of a substantial portion of its assets used for the production of Supplies for Buyer or a merger, sale or exchange of stock or other equity interests that would result in a change in control of Seller without the prior written consent of Buyer, or (v) fails to remain competitive with respect to quality, technology, delivery, service or pricing of the Supplies. Seller shall notify Buyer within ten days after entering into any negotiations that could lead to the situation specified in subsection (iv) above, provided that upon Seller's request, Buyer will enter into an appropriate nondisclosure agreement related to information disclosed to Buyer in relation to such transaction.  Seller shall not suspend performance of the Order or terminate the Order for any reason.

21.     Termination for Convenience.  In addition to any other rights of Buyer to cancel or terminate the Order, Buyer may, at its option and in its sole discretion, immediately terminate all or any part of the Order (other than the

minimum quantities specified in Section 4) at any time and for any reason upon written notice to Seller. Upon receipt of written notice of termination, and unless otherwise directed by Buyer, Seller shall: (a) promptly terminate all work under the Order on the effective date of termination; (b) transfer title and deliver to Buyer the finished Supplies, the work in process, and the parts and materials that Seller reasonably produced or acquired according to quantities ordered by Buyer and that Seller cannot use in producing goods for itself or for others; (c) verify and settle any claims by sub-suppliers or subcontractors for actual costs incurred directly as a result of the termination; (d) take actions reasonably necessary to protect property in Seller's possession in which Buyer has an interest until disposal instruction from Buyer has been received; and (e) upon Buyer's request, cooperate with Buyer in transferring the production of Supplies to a different supplier, including as described in Section 22. Upon termination by Buyer under this Section, Buyer will be obligated to pay only the following without duplication as Seller's sole and exclusive remedy: (i) the Order price for all finished Supplies in the quantities ordered by Buyer that conform to the Order for which Seller has not been paid; (ii) Seller's reasonable actual cost of merchantable and useable work-in-process and the parts and materials transferred to Buyer under part (b) above; (iii) Seller's reasonable actual costs of settling claims regarding its obligations to its sub-suppliers or subcontractors required under the Order, to the extent directly caused by the termination, but limited to the amount of the firm quantities of Supplies and raw materials/components specified in Material Releases issued by Buyer and then currently outstanding; (iv) Seller's reasonable actual cost of carrying out its obligation under subsection (d), and (v) if applicable, amounts due in connection with Transition Support under Section 22(b). Notwithstanding any other provision, Buyer will have no further liability to Seller and without limiting the generality of the foregoing, Buyer will have no obligation for and will not be required to pay Seller, directly or on account of claims by Seller's sub-suppliers or subcontractors, for loss of anticipated profit, lost fees, lost business, loss of use, costs associated with business interruptions, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized capital or depreciation costs, finished goods, work-in-process or raw materials that Seller fabricates or procures in amounts exceeding those authorized in the Material Releases, or general administrative burden charges from termination of the Order, except as otherwise expressly agreed in a separate Order issued by Buyer. Buyer's obligation upon termination under this Section shall not exceed the obligation Buyer would have had to Seller in the absence of termination. Seller shall furnish to Buyer, within one calendar month after the date of termination, its termination claim, which shall consist exclusively of the items of Buyer's obligation to Seller that are expressly permitted by this Section. Buyer may audit Seller's records before or after payment to verify amounts requested in Seller's termination claim. Buyer shall have no obligation for payment to Seller under this Section if Buyer terminates the Order or portion thereof because of a default or breach by Seller including under Section 19 or under Section 23, and any termination shall be without prejudice to any claims which Buyer may have against Seller. Buyer shall have no responsibility under any circumstances, and Seller shall not assert any claim for, loss of profits or consequential damages.

22. <u>Transition of Supply</u>. (a) In connection with the expiration or termination of the Order by either party, in whole or in part, for any or no cause, or Buyer's decision to change to an alternate source of Supplies (including but not limited to a Buyer-owned or Buyer-operated facility) ("Alternative Supplier"), Seller shall cooperate in the transition of supply, including the following: (i) Seller shall continue production and delivery of all Supplies as ordered by Buyer, at the prices and other terms stated in the Order, without premium or other condition, during the entire period reasonably needed by Buyer to complete the transition to the alternate supplier(s) including, at Buyer's request, providing a sufficient bank of Supplies covered by the Order, such that Seller's action or inaction causes no interruption in Buyer's ability to obtain Supplies as needed; (ii) at no cost to Buyer, Seller (A) shall promptly provide all requested information and documentation regarding and access to Seller's manufacturing process, including on-site inspections, bill-of-material data, Tooling and process detail and samples of Supplies and components, (B) will provide all notices necessary or desirable for Buyer to resource the Order to an alternative supplier, (C) when requested by Buyer, will return to Buyer all Buyer's Property in as good condition as when received by Seller (reasonable wear and tear excepted); and (D) will comply with Seller's obligations relating to Seller's Property in Section 27 and in relation to subcontracts; (iii) Seller shall continue during the transition period subject to these same Terms and Conditions; and (iv) subject to Seller's reasonable capacity constraints, Seller will provide special overtime production, storage and/or management of extra inventory of Supplies, extraordinary packaging and transportation and other special services (collectively, "Transition Support") as expressly requested by Buyer in writing. (b) If the transition occurs for reasons other than Seller's termination or breach, Buyer will, at the end of the transition period, pay the reasonable, actual cost of Transition Support as requested and incurred, provided that Seller has advised Buyer prior to incurring such amounts of its estimate of such costs. If the

parties disagree on the cost of Transition Support, Buyer will pay the agreed portion to Seller and pay the disputed portion into third-party escrow for disbursement by arbitration. (c) The provisions of Section 22(b) notwithstanding, in the event that Seller is located in the Supplier industrial park immediately adjacent to Buyer's facility in Chattanooga, Tennessee (the "VW Park"), then in connection with the expiration or termination of the Order by either party, in whole or in part, for any or no cause, or Buyer's decision to change to an alternative supplier, Buyer shall have the right to purchase, at its sole option, and Seller hereby agrees to sell and assign to Buyer upon request, all of Seller's assets located in the VW Park, including without limitation Seller's real and personal property, equipment, fixtures, work in process, inventory, contract rights, and intellectual property rights, at Seller's then book value for such assets. For clarification, no provision herein shall be construed to provide Seller with the right to suspend or terminate the Order.

23. <u>Force Majeure</u>. Any delay or failure of either party to perform its obligations will be excused if and to the extent that the party is unable to perform due to an event or occurrence beyond its reasonable control and without its fault or negligence, such as: acts of God; restrictions, prohibitions, priorities or allocations imposed or actions taken by a governmental authority (whether valid or invalid); embargoes; floods, earthquakes, natural disasters; riots; wars; sabotage; or court injunction or order. Seller's inability to perform as a result of, or delays caused by, Seller's insolvency or lack of financial resources is deemed to be within Seller's control. The change in cost or availability of materials or components based on market conditions, supplier actions, or contract disputes or any labor strike or other labor disruption applicable to Seller or any of its subcontractors or sub-suppliers, will not excuse Seller's performance (under theories of force majeure, commercial impracticability or otherwise), and Seller assumes these risks. As soon as possible (but no more than one full business day) after the occurrence, Seller shall provide written notice describing such delay and assuring Buyer of the anticipated duration of the delay and the time that the delay shall be cured. During the delay or failure to perform by Seller, Buyer may, at its sole option: (a) purchase Supplies from other sources and reduce its schedules to Seller by such quantities, without liability to Seller; (b) require Seller to deliver to Buyer at Buyer's expense all finished goods, work in process and parts and materials produced or acquired for work under the Order; and/or (c) request Seller provide Supplies from other sources (including other sellers) in quantities and at a time requested by Buyer and at the price set forth in the Order. In addition, Seller shall provide advance written notice of any anticipated labor disruption or expiration of any of Seller's labor contracts, and Seller shall, at its expense, take all necessary actions to ensure the supply of Supplies to Buyer for a period of at least thirty (30) days during any anticipated labor disruption or resulting from the expiration of any of Seller's labor contracts. If upon request of Buyer, Seller fails to provide within ten (10) days (or such shorter period as Buyer requires) adequate assurance that any delay will not exceed thirty (30) days, or if any delay lasts longer than thirty (30) days, Buyer may terminate the Order without liability and Seller shall reimburse Buyer for costs associated with both the termination and the transition to a new supplier.

24. <u>Technology</u>. (a) All Supplies, Tooling (as defined below), and all other deliverables, data, inventions (whether or not patentable), industrial designs, technical information, know-how, processes of manufacture and other intellectual property and information created, developed, conceived or first reduced to practice by or on behalf of Seller (including, without limitation, by any person or entity employed or hired by or working under the direction of Seller) or acquired by Seller under this Order, and for which Buyer has agreed to reimburse Seller, along with all intellectual property rights relating thereto, are the sole and exclusive property of Buyer upon payment. Seller will promptly disclose in an acceptable form and assign to Buyer all such deliverables, data, inventions (whether or not patentable), industrial designs, technical information, know-how, processes of manufacture and other intellectual property and information. Seller will cause its employees to sign any papers necessary to enable Buyer to file applications for patents throughout the world and to record rights in and to such intellectual property. To the extent that such intellectual property includes any works of authorship (including, without limitation, software) created by or on behalf of Seller, such works shall be considered "works made for hire", and to the extent that such works do not qualify as "works made for hire," Seller hereby assigns to Buyer all right, title, and interest in all copyrights and moral rights therein. (b) Seller acknowledges and agrees that Buyer and Buyer's subcontractor(s) (including their affiliates and subcontractors) have a worldwide, irrevocable right to repair, reconstruct or rebuild, and to have repaired, reconstructed or rebuilt, Supplies delivered under this Order without payment of any royalty or other compensation to Seller. (c) Seller hereby grants to Buyer, its subsidiaries and affiliates, and their respective successors and assigns, and Buyer hereby accepts, a non-exclusive, irrevocable, worldwide license, including the right to sublicense others in connection with providing the Supplies to Buyer under: (i) patents, industrial designs, technical information, know-how, processes of manufacture and other intellectual property, owned or controlled by Seller or its affiliates, and relating to the Supplies, to make, have made,

12

PUBLIC DOCUMENT
Case 1:22-cv-00191-CEA-CHS   Document 23-2   Filed 07/27/22   Page 12 of 20   PageID #: 1212

repair, reconstruct, rebuild, relocate, use, sell, offer to sell and import the Supplies, and (ii) any works of authorship fixed in any tangible medium of expression (including, without limitation, drawings, prints, manuals and specifications) furnished by Seller in the course of Seller's activity under an Order, to reproduce, distribute, and display such works, and to prepare derivative works based thereon, subject to the other provisions of this Order (all items in clauses (c)(i) and (ii) above, collectively, "Seller's Intellectual Property", and such license in respect thereof, the "License").  Seller acknowledges and agrees that this License shall be effective from the first date of acceptance of the Order (or such earlier date as specified below) and extend until the expiration of Seller's services parts obligation hereunder (the "License Period").  Except as provided for below, Buyer agrees to pay to Seller a reasonable royalty for the License, and Seller acknowledges that for a period of two Model Years from Seller's first delivery of Supplies under an Order for Supplies to be incorporated into a vehicle ("Model Years" being full or partial model years as established by Buyer) (or if the Supplies are for some other purpose, for a period of two calendar years from the first delivery of Supplies under an Order) such reasonable royalty shall be deemed to be included in the prices paid by Buyer for such Supplies, and thereafter the License shall be deemed to have its royalty fully paid-up.  Buyer and Seller acknowledge and agree that the License granted and accepted under this subsection 24(c) shall take immediate effect (if not already in effect) in the event that: (A) an Order for Supplies is terminated by Buyer, and/or (B) in the event that Seller for any reason is unable to satisfy the quality, quantity, delivery or related requirements of Buyer for Supplies under an Order and/or additional orders and Buyer resources the Supplies, and in each case, the License shall survive the events in (A) or (B) including termination of the Order and continue (even beyond the License Period) until terminated by Buyer and shall be deemed fully paid up and royalty-free except as provided in the next sentence.  In the event that Buyer terminates the Order prior to the end of the License Period (except in the case where Buyer terminates the Order due to a breach by Seller), Buyer shall pay an additional amount to Seller as a royalty during the License Period (or earlier termination date if Buyer terminates the License prior to the end of License Period) and Buyer and Seller shall negotiate a commercially reasonable amount for such royalty.  (d) Rights under this Section 24 are intended to be subject to 11 USC Section 365(n), as an executory agreement, including the License under which Buyer has license rights to Seller's Intellectual Property, and are supplementary to any other rights of Buyer under existing Orders and any other agreements with Seller.  Seller shall ensure that all of its sub-suppliers and subcontractors are bound by the terms and conditions of this Section 24.  (e) All Supplies or other deliverables provided under this Order (including, for example, computer programs, technical specifications, documentation and manuals), shall be original to Seller and shall not incorporate, or infringe upon, any intellectual property rights (including, without limitation, copyright, patent, trade secret, mask work, or trademark rights) of any third party, unless otherwise expressly agreed to in writing on behalf of Buyer by an authorized representative of Buyer.  (f) Seller agrees: (i) to defend, hold harmless and indemnify Buyer, its successors and assigns against any suit, claim or action for actual or alleged direct or contributory infringement of or inducement to infringe any proprietary right (including any patent, trademark, copyright, moral, industrial design right or other proprietary right or misuse or misappropriation of trade secret) and against any resulting damages or expenses (including attorney's and other professional fees, settlements and judgments) arising in any way in relation to Supplies covered by this Order (including without limitation their manufacture, purchase, use and/or sale), including such claims where Seller has provided only part of Supplies, and Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specifications, (ii) to waive any claim against Buyer, including any hold- harmless or similar claim, in any way related to a third-party claim asserted against Buyer for infringement of any proprietary right (including any patent, trademark, copyright, moral, industrial design right or other proprietary right or misuse or misappropriation of trade secret), including claims arising out of specifications furnished by Buyer, and (iii) that if the sale or use of the Supplies is enjoined or, in Buyer's sole judgment, is likely to be enjoined, Seller will, at Buyer's election and Seller's sole expense, procure for Buyer to right to continue using the Supplies, replace the same with equivalent non-infringing goods or modify such Supplies so they become non-infringing.

25. <u>Buyer's Property</u>.  (a) All information and materials, including without limitation, Tooling (as defined below), packaging, documents, standards, designs, drawings, specifications, samples, trade secrets, manufacturing processes, marketing and pricing data, proprietary information, intellectual property rights, and other materials and items (including whether or not such materials are in any way modified, altered, or processed) furnished by Buyer either directly or indirectly to Seller to perform the Order, along with any and all Supplies, Tooling, deliverables, data, and intellectual property rights under Section 24, for which Buyer has agreed to reimburse or has reimbursed Seller, shall be and remain the sole and exclusive property of Buyer (collectively, "Buyer's Property"), provided that Buyer shall become the owner of any item of Tooling upon payment for such item of Tooling.  Any and all goods manufactured by Seller using Buyer's Property may not be used for Seller's own use or

manufactured or provided to third parties without Buyer's express written authorization.  (b) Buyer does not guarantee the accuracy of, or the availability or suitability of, Buyer's Property supplied by Buyer.  Seller shall assume all risk of death, injury to persons, or damage to property arising from the use of Buyer's Property. TO THE EXTENT PERMITTED BY LAW, BUYER SHALL HAVE NO LIABILITY TO SELLER OR ANYONE CLAIMING BY OR THROUGH SELLER FOR ANY, AND SELLER HEREBY WAIVES ANY RIGHT TO, INCIDENTAL OR CONSEQUENTIAL OR OTHER DAMAGES OF ANY KIND WHATSOEVER RELATING TO BUYER'S PROPERTY.  BUYER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO BUYER'S PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND SELLER WAIVES, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, ALL CLAIMS OF NEGLIGENCE AND STRICT LIABILITY.  (c) Buyer's Property shall be held by Seller or by an authorized third-party, to the extent that Seller has transferred possession of Buyer's Property to an authorized third-party, on a bailment basis as a bailee-at--will.  Seller bears the risk of loss of and damage to Buyer's Property.  Seller is solely responsible for inspecting, testing, and approving all Buyer's Property prior to any use, and Seller assumes all risk of injury to persons or property arising from Buyer's Property.  Buyer's Property shall be housed, maintained, repaired, and replaced by Seller at Seller's expense in good working condition capable of producing Supplies meeting all applicable specifications, shall not be used by Seller for any purpose other than the performance of the Order, shall be deemed to be personalty, shall be conspicuously marked with asset tags or some other means by Seller as the property of Buyer, shall not be commingled with the property of Seller or with that of a third-party, and shall not be moved from Seller's premises without Buyer's prior, written approval.  Seller shall insure Buyer's Property with full fire and extended coverage insurance for its full replacement value. Any replacement of Buyer's Property shall become Buyer's property.  Seller shall not release or dispose of Buyer's Property to any third-party without the prior express written permission of Buyer.  Buyer shall have the right to enter Seller's premises to inspect Buyer's Property and Seller's records regarding Buyer's Property. Only Buyer has any right, title, or interest in Buyer's Property, except for Seller's limited right, subject to Buyer's sole discretion, to use Buyer's Property in the manufacture of Supplies.  Effective immediately upon written notice to Seller, without further notice or legal action, Buyer has the right to enter the premises of Seller and take possession of all of Buyer's Property without payment of any kind.  Seller expressly waives any right to additional notice or process and agrees to provide Buyer or its nominee(s) with immediate access to Buyer's Property.  Seller grants to Buyer a limited and irrevocable power of attorney, coupled with an interest, to execute and record on Seller's behalf any notice financing statements with respect to Buyer's Property that Buyer determines are reasonably necessary to reflect Buyer's interest in Buyer's Property.  At Buyer's request, Buyer's Property shall be immediately released to Buyer or delivered by Seller to Buyer either (i) FCA (loaded) transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of Buyer's selected carrier, or (ii) to any location designated by Buyer, in which case Buyer will pay Seller the reasonable costs of delivery.  Seller waives, to the extent permitted by law, any lien or other rights that Seller might otherwise have on any of Buyer's Property, including, but not limited to, molder's and builder's liens, or any liens or other rights that Seller might otherwise have on Buyer's Property for work performed on such property, for the purchase price of Supplies, or otherwise.

26.     <u>Confidentiality</u>.  Seller acknowledges that Buyer's Property includes proprietary and confidential information ("Confidential Information"), regardless of whether such information is marked or identified as confidential, and is delivered to Seller on a confidential and nonpublic basis for the purpose of performing the Order only.  All terms of the Order are deemed proprietary and confidential information of Buyer.  Seller agrees to keep all Confidential Information in strictest confidence, and further agrees not to disclose or permit disclosure to others, or use for other than the purpose of the Order, any such Confidential Information.  Seller shall (i) disclose Buyer's Confidential Information within Seller's organization only to those employees who have a need to know in order to fulfill Seller's obligations hereunder and who have agreed to keep the Buyer's Confidential Information confidential, and (ii) prevent any of Buyer's Confidential Information from being divulged to third persons not employed by Seller without the prior written consent of Buyer, including having recipients acknowledge the confidential status of such Buyer's Confidential Information and agree to similar restrictions.  This obligation of confidence shall survive termination of the Order and shall continue for the longer of (i) a period of five years from the date of disclosure of Confidential Information covered by this Section, or (ii) a period ending three years after termination or expiration of any related Order, or (iii) as long as Buyer's Confidential Information remains a trade secret, unless a specific period is specified in writing by Buyer.  The restrictions and obligations of this Section will not apply to information that: (a) is already publicly known at the time of its disclosure by Buyer; (b) after disclosure by Buyer becomes publicly known through no fault of Seller; (c) Seller

14

can establish by written documentation was properly in its possession prior to disclosure by Buyer or was independently developed by Seller without use of or reference to Buyer's Confidential Information and without any restriction on disclosure, or (d) is disclosed pursuant to law, regulation or lawful order or process. In such event, Seller shall promptly notify Buyer of the disclosure requirement to permit Buyer to oppose or limit such disclosure. Notwithstanding anything to the contrary in this Order, any confidentiality or non-disclosure agreement between the parties that predates this Order will remain in effect except as expressly modified by this Order, and to the extent of a conflict between the express terms of such an agreement relating to Buyer's Confidential Information and this Section 26, the terms of that agreement will control with respect to Buyer's Confidential Information.

27. <u>Seller's Property</u>. Seller, at its expense, shall furnish, maintain, and keep in good working condition capable of producing Supplies meeting all applicable specifications, and replace when necessary, all materials, machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns, blueprints, designs, specifications, drawings, photographic negatives and positives, art work copy layout, and other items that are not Buyer's Property and that are necessary for the production of Supplies under any Order ("Seller's Property"). Seller shall insure Seller's Property with full fire and extended coverage insurance for its full replacement value. If Seller uses Seller's Property to produce goods or services similar to Supplies for other customers, including aftermarket customers, such goods or services will not incorporate any of Buyer's Property, logos, trademarks, tradenames, or part numbers. Seller shall not disclose or imply in its marketing efforts that such goods or services are equivalent to those purchased by, or configured for, Buyer. Seller grants to Buyer an irrevocable option to take possession of and title to Seller's Property that is special for production of Supplies under an Order (including, by way of example, and without limitation, Seller's Property specially designed or configured for the manufacture or assembly or other processing of Supplies), upon payment to Seller of its net book value less any amounts that Buyer has previously paid to Seller for the cost of such items, or (if applicable) any such other amount as may be required by applicable law. This option does not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's option rights under this Section with respect to Seller's Property are intended to be subject to Buyer's rights and elections under 11 USC Section 365(n), as and to the extent that such Seller's Property represents embodiments of intellectual property, including intellectual property licensed by Seller to Buyer under Section 24(c) above.

28. <u>Tooling</u>. This Section applies to orders for tooling, fixtures, gauges, jigs, patterns, castings, cavity dies and molds, with all related appurtenances, accessions, and accessories required to manufacture the Supplies ("Tooling"). (a) Buyer shall pay in full for any Tooling it orders upon completion of Note l status (as defined by Buyer) ("Tooling Payment"). Once the Tooling Payment has been paid by Buyer, title to the Tooling including, but not limited to, any and all intellectual property rights with respect thereto shall immediately pass to Buyer. All of Buyer's Tooling, whether in Seller's possession or the possession of a sub-supplier or subcontractor of Seller, shall become and remains the property of and owned by Buyer in accordance with the passing of title as set forth herein. Seller shall permanently mark all such Tooling as Buyer's property by using asset tags or similar identifying materials. Buyer's Tooling shall not be sold, assigned by way of security, pawned, mortgaged, charged, or otherwise encumbered or disposed of, nor used to manufacture goods for parties other than Buyer, without the prior written consent of Buyer. With the prior written consent of Buyer, Seller may maintain the Tooling on the premises of a sub-supplier or subcontractor, solely as a bailment and otherwise on terms and conditions established by Buyer. Tooling shall not be commingled with other property of Seller or any third-party, shall not be moved from its location, whether at Seller's facility or that of a sub-supplier or subcontractor, without prior written consent of Buyer, and shall be insured by Seller, at its expense, against loss or damage (including insurance for its full replacement value). Seller, at its expense, shall maintain the Tooling in good condition, wear and tear included, and immediately replace any items associated with the Tooling which are lost, destroyed or worn out. Regardless of ownership, Seller shall retain and maintain the Tooling in accordance with these provisions for fifteen (15) years after the termination or expiration of Seller's provision of the Supplies to Buyer. Seller shall ensure that all of its sub-suppliers and subcontractors in possession of Buyer's Tooling are bound by the terms and conditions of this provision. The obligations set forth in this provision shall survive the expiration, termination, or cancellation of any Order. (b) Seller shall provide to Buyer, as requested, access to Seller's premises and all documentation relating to the Tooling, prior and subsequent to payment, to inspect work performed and to verify charges submitted by Seller against the Order. For any Tooling or parts thereof that Seller obtains from any third party, Seller shall provide Buyer with such access and documentation to the ultimate production source. Seller shall have ninety (90) days from the date Buyer notifies Seller of Buyer's intention to

audit Seller to provide the requested access and copies of requested documentation for Buyer's exclusive use and records. Any information submitted following such ninety (90) day period need not be considered by Buyer. The price set forth in the Order shall be adjusted to credit Buyer in the amount, if any, by which the price exceeds Seller's actual cost as verified. If Seller's primary business is to fabricate Tooling, Seller will be permitted a reasonable profit percentage as indicated by the Order. In the absence of a mutually-accepted profit percentage, Buyer may determine a reasonable profit percentage following the completion of its audit. Seller shall invoice Buyer for (and Buyer will only be obligated to pay) the lower of Seller's actual cost plus such profit percentage or the amount set forth in the Order. Seller shall not disclose to any third-party, except for its attorneys and professional advisors who are required to maintain confidentiality, the results of such Tooling audits or any adjustments made by Buyer to the prices and amounts payable to Seller as a result of such audit. Seller shall retain (and cause its Tooling sub-suppliers and subcontractors to retain) all cost records for a period of three years after receiving final payment of the charges. All Tooling is to be made to Buyer's specifications. Any exception to such specifications must be stated in writing on the Order or otherwise in a signed writing by an authorized representative of Buyer. To the extent the Order expressly states that it is for "tooling" and unless otherwise stated in the Order, freight terms are DDP Buyer's facility — Freight Collect, and Seller shall not prepay or add freight charges. (c) To the extent permitted by applicable law, any payments made by Buyer for Buyer-owned Tooling are expressly intended by Buyer to be held in trust for the benefit of any sub-supplier(s) or subcontractor(s) used by Seller to produce the Buyer-owned Tooling that are covered by such payments and Seller agrees to hold such payments as trustee in trust for such sub-supplier(s) or subcontractor(s) until Seller has paid the sub-supplier(s) or subcontractor(s) in full for the Buyer-owned Tooling. Seller acknowledges and agrees that such sub-supplier or subcontractor is an intended third-party beneficiary of the terms of this Section 28(c) relating to the trust and as such, such Tooling sub-supplier or subcontractor shall have the right to enforce the terms of this Section 28(c) directly against Seller in the sub-supplier or subcontractor's own name. Seller agrees that Buyer has no obligation to Seller or Seller's Tooling sub-supplier or subcontractor under this Section other than making the payment to Seller in accordance with a Tooling Purchase Order. In the event Seller's Tooling sub-supplier or subcontractor brings an action against Seller under this section, Seller agrees that it shall not join Buyer in any such action.

29. <u>Set-Off; Recoupment</u>. In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness or obligations of Seller and its affiliates or subsidiaries to Buyer and its affiliates or subsidiaries. Buyer shall have the right to setoff against or to recoup from any payment or other obligation owed to Seller, in whole or in part, without advance notice, any amounts due to Buyer or its affiliates or subsidiaries from Seller, its affiliates, or its subsidiaries. Buyer will provide Seller with a statement describing any offset or recoupment taken by Buyer.

30. <u>Information Disclosed to Buyer</u>. Seller shall not assert any claim against Buyer or its suppliers or contractors with respect to any technical information that Seller has disclosed or may disclose to Buyer in connection with the Supplies covered by the Order, except to the extent expressly covered by a separate written confidentiality and/or license agreement signed by Buyer or by a valid patent expressly disclosed to Buyer prior to or at the time of the Order.

31. <u>No Publicity</u>. Seller shall not advertise, publish, or disclose to any third-party (other than to Seller's professional advisors on a confidential and need-to-know basis) in any manner the fact that Seller has contracted to furnish Buyer the Supplies covered by the Order or any terms of the Order (including prices), or use any trademarks or trade names of Buyer in any press release, advertising or promotional materials, without first obtaining Buyer's written consent.

32. <u>Relationship of Parties</u>. Seller and Buyer are independent contracting parties and nothing in the Order shall make either party the employee, agent, or legal representative of the other for any purpose. The Order does not grant either party any authority to assume or to create any obligation on behalf of or in the name of the other. Seller shall be solely responsible for all employment and income taxes, insurance premiums, charges and other expenses it incurs in connection with its performance of the Order, except as expressly provided in a written agreement signed by Buyer. All employees and agents of Seller or its respective suppliers or contractors are employees or agents solely of Seller or such suppliers or contractors, and not of Buyer, and are not entitled to employee benefits or other rights accorded to Buyer's employees. Buyer is not responsible for any obligation with respect to employees or agents of Seller or its suppliers or contractors.

33. <u>Electronic Communication</u>. Buyer may use electronic purchase orders, Material Releases and other electronic forms. Seller shall comply with the method of electronic communication specified by Buyer. Buyer reserves the right to set policies and procedures for implementation or modification of Buyer's specified method of electronic communication.

34. <u>Conflict of Interest</u>. Seller represents and warrants that its performance of the Order will not in any way conflict with any continuing interests or obligations of Seller or its employees, suppliers or contractors. Seller further warrants that while the Order is in effect, Seller and those of its employees, suppliers and contractors participating in the performance of the Order will refrain from any activities which could reasonably be expected to present a conflict of interest with respect to Seller's relationship with Buyer or its performance of the Order.

35. <u>Assignment</u>. (a) Seller shall not, without Buyer's prior written consent (on the face of an Order or in a signed writing by an authorized representative of Buyer), (i) assign or delegate (including without limitation by subcontract) its obligations under the Order, or (ii) enter or offer to enter into a transaction that includes a sale of a substantial portion of its assets used for the production of the Supplies for Buyer or a merger, sale or exchange of stock or other equity interests that would result in a change of control of Seller. In the event of any approved assignment (including, without limitation, subcontract), sale or delegation authorized by Buyer, Seller retains all responsibility for Supplies, including all related warranties and claims, unless otherwise expressly agreed in writing by Buyer. (b) With Buyer's prior written consent, which shall not be given until Seller provides any requested documentation to Buyer, Seller may make an assignment of receivables due or to become due to a single financial institution; provided, however, that any such assignment shall be subject to set-off (see Section 29 above) or other proper method of enforcing any claims that Buyer may have under the Order. (c) Buyer will have the right to assign any benefit or duty under an Order to any third-party upon written notice to Seller, with or without consent, and shall thereafter be released of such duty.

36. <u>Sales Tax Exemption.</u> The Supplies purchased under the Order are identified as industrial processing and may be exempt from sales taxes. In such case, the tax identification number and/or other exemption information are stated in the Order or are otherwise provided by Buyer.

37. <u>Governing Law</u>. An Order will be governed by the laws of the State of Tennessee and the United States of America. The provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict-of-laws provisions that would require application of another choice of law are excluded. The arbitration provisions herein, including their enforceability, will be further governed as set forth in Section 38.

38. <u>Resolution of Claims and Disputes</u>.

38.1 The parties agree to resolve all claims and disputes ("Claims") in accordance with this Section 38. For purposes of the Order, a Claim includes any demand, assertion, request or other claim made with respect to any matter arising out of or related to the Supplies and/or the Order. Claims must be made by written notice specifying the existence and nature of the claim provided within a reasonable time following the occurrence of the event giving rise to the Claim. The responsibility to substantiate Claims shall rest with the party making the Claim.

(a) Initial Meeting. Not less than ten (10) days following receipt of such written notice, the parties shall meet and attempt to resolve such Claim at the field level (the "Initial Meeting") through discussions between both parties' respective field representatives (the "Representatives").

(b) Second Meeting. If the Representatives cannot resolve the Claim within thirty (30) days after the Initial Meeting, then, upon the request of either party, the parties' managers, supervisors, or other designated executives (the "Executives") shall meet again and attempt to resolve such Claim (the "Second Meeting").

(c) Meeting Procedures. At least three (3) Business Days prior to any meetings between the parties, including the Representatives, the parties shall exchange any relevant information that will assist the parties in resolving the Claim. Either party may elect to be accompanied at any meeting by an attorney provided that the party intending to be accompanied by an attorney shall give the other party at least five (5) days' notice of such intention.

(d)  Mediation. If the Claim is not resolved not within fourteen (14) days after the Second Meeting, the parties shall submit the Claim to non-binding mediation. If the parties cannot agree on a mediator, the parties shall submit the Claim to the American Arbitration Association ("AAA") for mediation administered in accordance with the Commercial Arbitration Rules and Mediation Procedures of the AAA ("AAA Rules") then in effect. Not less than seven (7) days after the selection of the mediator, the parties and the mediator shall participate in a pre-mediation conference to determine the time and place of the mediation. All fees and expenses of the mediator shall be shared equally by the parties and each party shall submit to the mediator such information or position papers as the mediator may request to assist in resolving the Claim. The parties (i) will not attempt to subpoena or otherwise use as a witness any person who serves as a mediator and (ii) will assert no claims against the mediator as a result of the mediation

(e)  Arbitration. All Claims not settled or resolved by the parties in accordance with the settlement and mediation procedures set forth herein shall be resolved by binding arbitration and each party shall act in accordance with the AAA Rules and in accordance with these Terms. Notwithstanding any other provision herein to the contrary, if a Claim is not settled or resolved within one hundred and twenty (120) days after the Initial Meeting, either party may submit the Claim to binding arbitration in accordance with the AAA Rules and in accordance with these Terms.

(f)  Equitable Relief. Notwithstanding any other provision herein to the contrary, either party may, with respect to a Claim, apply to a court for equitable relief, including a temporary restraining order, preliminary injunction or other interlocutory or relief, provided that such application for equitable relief will not delay or adversely affect in any material respect the date set by Buyer for completion of the project. The Arbitration Panel (as defined below) shall have the authority to modify any court order granting such interlocutory relief and such court order shall remain in full force and effect until so modified. Any such court or Arbitration Panel order may be enforced in any court having jurisdiction thereof. Any court relief sought under this Section shall be brought in and subject to the exclusive venue and jurisdiction of the courts of Hamilton County, Tennessee or the U.S. District Court for the Eastern District of Tennessee, as applicable, provided that Buyer may elect to seek such relief against Seller in any court having jurisdiction over Seller.

(g)  Continuing Obligations. In the event of any dispute arising by or between the parties, each party shall continue to perform as required under the Contract notwithstanding the existence of such dispute. In the event of such a dispute, Buyer shall continue to pay the Seller as provided in the Agreement, except for that amount which may be disputed.

(h)  Arbitration Proceedings. The arbitration provisions under the Agreement, including their enforceability, shall be governed by the Federal Arbitration Act or the Tennessee Uniform Arbitration Act, as applicable ("Arbitration Acts"). All arbitration proceedings shall be conducted in Hamilton County, Tennessee, USA in the English language in accordance with the AAA Rules.

(i)  Arbitrator Qualifications. Unless the parties otherwise agree in writing, the arbitration shall be conducted using a panel of three (3) arbitrators ("Arbitration Panel") who are selected by the parties in accordance with the AAA Rules from the AAA National Commercial Panel and who are practicing attorneys who have experience with respect to equipment and supplies transactions for large manufacturing facilities. If the procedures of the AAA Rules do not result in the selection by the parties of a panel of three (3) arbitrators, then each party shall appoint to the Arbitration Panel one (1) neutral arbitrator who meets the required qualifications, and the two (2) neutral arbitrators selected by the parties shall appoint a third neutral arbitrator who meets such qualifications. If either party does not appoint a neutral arbitrator within two (2) weeks of being notified that it is required to do so, the AAA will appoint an arbitrator for such party.

(j)  Arbitration Award. The Arbitration Panel shall issue a written, reasoned award stating the bases of the award and including detailed findings of fact and conclusions of law. The award rendered by the Arbitration Panel shall be final, and judgment may be entered upon it and enforced without prejudice to the rights of either party to seek vacation of the award in accordance with the Arbitration Acts in any court having jurisdiction thereof.

(k) Arbitration Fees and Expenses; Attorneys' Fees. Fees and expenses in connection with the arbitration, including without limitation reasonable attorneys' fees and dispute resolution costs, in addition to any other damages or other amounts to which it may be entitled, shall be awarded to the prevailing party. The failure by one party to pay its share of arbitration fees and expenses in accordance with the AAA Rules shall constitute a waiver of such party's Claim or defense in the arbitration.

(l) Confidentiality. All arbitration proceedings and other information and matters relating to the arbitration shall be confidential, except to the extent that disclosure is necessary to enforce an arbitration award in a court of competent jurisdiction; provided that any such disclosure shall be to the most limited extent possible to accomplish such enforcement of the award and either party may seek a protective order in connection therewith. The parties agree to maintain such confidentiality.

(m) Waiver of Joinder Objection. Seller waives all objections to joinder of Seller as a party to any mediation, arbitration or litigation related to the Order in which Buyer is joined with respect to which Seller's conduct or Supplies have some relationship. Seller also agrees to include in all contracts used or prepared by Seller similar waivers on behalf of any and all individuals or entities with whom Seller enters into a contract. Such contracts in which Seller must include similar waivers include without limitation, contracts between Seller and any individual or entity having a direct contract with Seller for any Goods or Services relating to the Order, and any general and supplemental conditions applicable to such contracts.

(n) Joinder. Either party may include by joinder individuals or entities in accordance with the AAA Rules.

39. Severability; No Implied Waiver. If any term of the Order is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, the term will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with applicable law. The remaining provisions of the Order will remain in full force and effect. The failure of either party at any time to require performance by the other party of any provision of the Order will not affect the right to require performance at any later time, nor will the waiver of either party of a breach of any provision of the Order constitute a waiver of any later breach of the same or other provision of the Order.

40. Survival. The obligations of Seller to Buyer survive termination of the Order, except as otherwise provided in the Order.

41. Waiver of Jury Trial. BUYER AND SELLER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF BUYER AND SELLER, AFTER CONSULTING (OR HAVING THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY ORDER OR OTHER DOCUMENT PERTAINING TO ANY ORDER.

42. Entire Agreement; Modifications; Buyer's Website. (a) Except as described in Section 1, the Order, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced therein, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in the Order. The Order may only be modified (i) by a written amendment executed by authorized representatives of each party or, (ii) for changes within the scope of Section 10, by a purchase order amendment issued by Buyer. (b) Buyer may modify purchase order terms and conditions from time to time by providing revised purchase order terms and conditions to Seller or posting revised purchase order terms and conditions to Buyer's internet website (or such other website as may be directed through links available on such website) ("Buyer's Website") at www.vwgroupsupply.com or as otherwise specified on the face of this Order prior to the date when any modified terms and conditions become effective. Such revised purchase order terms and conditions shall apply to all purchase order revisions/amendments and new Orders issued on or after the effective date thereof. Seller shall be responsible to review Buyer's Website periodically. (c) Buyer's Website may also contain specific additional requirements for certain items covered by this Order, including labeling, packaging, shipping, delivery and quality specifications, procedures, directions and/or instructions. Any such requirements shall be deemed to form part of the Terms and the Order. Buyer may periodically update such requirements by posting revisions thereto on

Buyer's Website.  In the event of any inconsistency between the Order and Buyer's Website, the terms of the Order shall prevail, unless the requirements specified on Buyer's Website expressly provide otherwise.

43. <u>Claims by Seller</u>.  Any legal action or arbitration proceeding by Seller under any Order must be commenced no later than one (1) year after the breach or other event giving rise to Seller's claim occurs, or Seller becomes aware of the existence (or facts and circumstances giving rise to the existence) of such claim, whichever occurs first.

44. <u>Battle of the Forms Not Applicable</u>.  The parties have agreed and it is their intent that the battle of the forms described in Section 2-207 of the Uniform Commercial Code shall not apply to the Order or these Terms or to any invoice or acceptance form of Seller relating to the Order.  It is the parties' intent that the Order and these Terms shall exclusively control the relationship of the parties, and in the event of any inconsistency between any invoice or acceptance form sent by Seller to Buyer and the Order, the Order shall control.

45. <u>Interpretation</u>.  Buyer and Seller agree that the Order including these Terms were negotiated by the parties with the benefit of legal representation, and any rule of construction or interpretation otherwise requiring provisions to be construed or interpreted against any party as having been drafted by it will not apply.